**Robert HORTON, As Next Friend of Robby Horton, Heather Horton and Sandra Sanchez, On Their Own Behalf and On Behalf of All Others Similarly Situated, Plaintiffs-Appellants,**

v.

**GOOSE CREEK INDEPENDENT SCHOOL DISTRICT, Defendant-Appellee.**

No. 81–2215.

United States Court of Appeals, Fifth Circuit.

June 1, 1982.

Arthur Val Perkins, Stefan Presser, Houston, Tex., for plaintiffs-appellants.

Richard A. Peebles, Baytown, Tex., for defendant-appellee.

Before WISDOM, RANDALL and TATE, Circuit Judges.

WISDOM, Circuit Judge:

This case presents a question of first impression in this circuit: as a matter of constitutional law, can a school district, acting in good faith in an effort to deal with a serious drug and alcohol problem, subject students, their lockers, and their automobiles to the exploratory sniffing of dogs trained to detect certain contraband? We must consider the special circumstances peculiar to the public school environment, the duty of school officials to protect the minors in their care, the growing problem of drug and alcohol abuse in the schools, the students' interest in the integrity of their persons and effects, and the importance of demonstrating to the young that constitutional guarantees are not only lofty theories but do in practice control our government. Bearing in mind all these considerations, we hold that the dogs' sniffing of the children was unconstitutional. We conclude, however, that the dogs' sniffing of cars and lockers does not rise to the same level of intrusiveness, and we hold that, in the school environment, such sniffing operations are permissible.

I.

The named plaintiffs, Robby Horton, Heather Horton, and Sandra Sanchez, brought this action by their next friend, Robert Horton, seeking to represent all students enrolled in the Goose Creek Consolidated Independent School District (GCISD) in a challenge under 42 U.S.C. § 1983 of the defendant school district's canine drug detection program.

The defendant, GCISD, adopted the challenged program in response to a growing drug and alcohol abuse problem in the schools. It contracted with a security services firm, Securities Associates International, Inc. (SAI), that provides dogs trained to alert their handlers to the presence of any one of approximately sixty different substances, including alcohol and drugs, both over-the-counter and controlled. The defendant conducted assemblies in the elementary schools to acquaint the children with the dogs and informed students in the junior and senior high schools of the program. On a random and unannounced basis, the dogs are taken to the various schools in the district, where they sniff students' lockers and automobiles. They also go into the classrooms, on leashes, to sniff the students themselves. During their "playtime" at the schools, the dogs are sometimes taken off their leashes. When a dog alerts the handler to the odor of an illicit substance on a student's person, after the sweep of the class is completed and the dog and handler have departed, a school official discreetly asks the student to leave the class and go to the administrator's office, where he is subjected to a search of pockets, purse, and outer garments.[1] When a dog alerts his handler to an automobile, the student driver is asked to open the doors and the trunk. If he refuses, the school notifies the parents. When a dog alerts his handler to a locker, the school searches the locker without the consent of the student to whom it is assigned. If the student proves to possess substances that violate school policy, he may agree to seek outside counseling; otherwise, the administrator may recommend

---

1. The parties agree that no such intrusive searches as strip searches or body cavity searches occur.

to the superintendent that the student be suspended. Second-time violators do not have the option of counseling.

The named plaintiffs were all subjected to the sniffing of the canine drug detectors. Two of them, Robby Horton and Sandra Sanchez, triggered alerts. School officials questioned Sandra, took her purse, and searched it without her consent. They found a small bottle of perfume, which they returned to her. Robby was asked to empty his pockets, which he did. When nothing incriminating was found, the school officials searched his socks and lower pants legs but again found no contraband.[2]

The plaintiffs brought this action, alleging a violation of the fourth amendment prohibition of unreasonable searches and seizures and a violation of the fourteenth amendment prohibition of deprivations of liberty and property without due process. On a motion for class certification and cross-motions for summary judgment, the district court denied certification and held that the sniffing, although it is a search, is not unreasonable. Further, it held that reasonable cause is the standard for searches of students and their property by school officials acting *in loco parentis*, and the alert of the dogs provides reasonable cause for searches of lockers and cars as well as for searches of the pockets, purses, and outer garments of students. Finally, the district court held that the program does not violate the due process clause, because it subjects the students to minimal intrusion, humiliation, and fear. The plaintiffs appeal both on the merits and on the question of class certification.

## II.

Although the problem the merits present in this case is new to the Fifth Circuit, a district court in this circuit and appellate courts for the Seventh and Tenth Circuits have decided similar cases. In the most recent case, *Zamora v. Pomeroy*, 10 Cir. 1981, 639 F.2d 662, the Tenth Circuit upheld the use of dogs in exploratory sniffing of lockers. Although the focus of the opinion was the due process problem presented by the school's disciplinary action, the court did consider the fourth amendment issues. Noting that the school gave notice at the beginning of each school year that lockers were subject to being opened and that the school and the student possessed the locker jointly, the court held that the school administrator's duty to maintain an educational atmosphere in the school necessitated a reasonable right of inspection, even though the inspection might infringe a student's rights under the fourth amendment. *Id.* at 670.

The Seventh Circuit reached the same result on facts similar to those presented by the GCISD program. In *Doe v. Renfrow*, N.D.Ind.1979, 475 F.Supp. 1012, *op. adopted on this issue and rev'd on another issue*, 7 Cir. 1980, 631 F.2d 91 (per curiam), *cert. denied*, 451 U.S. 1022, 101 S.Ct. 3015, 69 L.Ed.2d 395 (1981), the school, with the assistance of the police, used dogs for general, exploratory sniffing of students. The court held that the sniff of a dog is not a search, particularly in view of the diminished expectations of privacy inherent in a public school, the school's right and duty *in loco parentis* to supervise students and maintain an educationally sound environment, and the minimal intrusion involved.

A district court in our own circuit, on the other hand, reached the opposite result, explicitly rejecting *Doe v. Renfrow*. *Jones v. Latexo Independent School District*, E.D. Tex.1980, 499 F.Supp. 223, 236 (1980). The Latexo Independent School District used dogs to sniff both students and automobiles. The court granted a preliminary injunction against the sniffing. In its view, the school environment was a factor to be considered, but it did not automatically outweigh all

---

**2.** We use "contraband" to refer to all substances that the school forbids students to possess, even if possession violates no law.

other factors. The absence of individualized suspicion, the use of large animals trained to attack, the detection of odors outside the range of the human sense of smell, and the intrusiveness of a search of the students' persons combined to convince the judge that the sniffing of the students was not reasonable. Since the students had no access to their cars during the school day, the school's interest in the sniffing of cars was minimal, and the court concluded that the sniffing of the cars was also unreasonable. The result in *Jones* appears to be that favored by the commentators, who have been unanimous in their criticism of *Doe v. Renfrow. See, e.g.,* Gardner, *Sniffing for Drugs in the Classroom—Perspectives on Fourth Amendment Scope,* 74 Nw. U.L.Rev. 803 (1980); Note, *The Constitutionality of Canine Searches in the Classroom,* 71 J.Crim.L. & Criminology 39 (1980); Comment, *Search and Seizure in Public Schools: Are Our Children's Rights Going to the Dogs?* 24 St. Louis U.L.J. 119, 131–33 (1979); *see also Doe v. Renfrow,* 451 U.S. 1022, 101 S.Ct. 3016, 69 L.Ed.2d 395 (1981) (Brennan, J., dissenting from denial of certiorari); *Doe v. Renfrow,* 7 Cir. 1980, 631

F.2d 91, 93 (Swygert, J., dissenting from denial of rehearing). It is against the background of this split in authority that we undertake our own analysis of the question.

The problem presented in this case is the convergence of two troubling questions. First, is the sniff of a drug-detecting dog a "search" within the purview of the fourth amendment? Second, to what extent does the fourth amendment protect students against searches by school administrators seeking to maintain a safe environment conducive to education? On each question, we find an abundance of precedent but scant guidance.

## A. The Canine Sniff as a Search

Frequent use of drug-detecting dogs by law enforcement officials has led to a great number of cases challenging the admissibility of the fruits of a canine sniff.[3] From these cases, one proposition is clear and universally accepted: if the police have some basis for suspecting an individual of possessing contraband, they may, consonant with the fourth amendment, use a drug-detecting dog to sniff the checked luggage,[4]

3. The following list is not exhaustive. *United States v. Johnson,* 2 Cir. 1981, 660 F.2d 21; *United States v. Viera,* 5 Cir. 1981, 644 F.2d 509, *cert. denied,* 454 U.S. 867, 102 S.Ct. 332, 70 L.Ed.2d 169; *United States v. Goldstein,* 5 Cir. 1981, 635 F.2d 356, *cert. denied,* 452 U.S. 962, 101 S.Ct. 3111, 69 L.Ed.2d 972; *United States v. Sullivan,* 4 Cir. 1980, 625 F.2d 9, *cert. denied,* 1981, 450 U.S. 923, 101 S.Ct. 1374, 67 L.Ed.2d 352; *United States v. Klein,* 7 Cir. 1980, 626 F.2d 22; *United States v. Burns,* 10 Cir. 1980, 624 F.2d 95, *cert. denied,* 449 U.S. 954, 101 S.Ct. 361, 66 L.Ed.2d 219; *United States v. Venema,* 10 Cir. 1977, 563 F.2d 1003; *United States v. Solis,* 9 Cir. 1976, 536 F.2d 880; *United States v. Race,* 1 Cir. 1976, 529 F.2d 12, 14 n.2; *United States v. Bronstein,* 2 Cir. 1975, 521 F.2d 459; *United States v. Fulero,* D.C.Cir.1974, 498 F.2d 748 (per curiam); *State v. Morrow,* 1981, 128 Ariz. 309, 625 P.2d 898; *State v. Martinez,* 1976, 113 Ariz. 345, 554 P.2d 1272 (adopting opinion published at 26 Ariz.App. 210, 547 P.2d 62); *State v. Quatsling,* 1975, 24 Ariz.App. 105, 536 P.2d 226, *cert. denied,* 1976, 424 U.S. 945, 96 S.Ct. 1416, 47 L.Ed.2d 352 (1976); *People v. Mayberry,* Cal. App.1981, 172 Cal.Rptr. 629, *hearing granted,* Cal.; *People v. Denman,* 1980, 112 Cal.App.3d 1003, 169 Cal.Rptr. 742; *People v. St. George*

*Matthews,* 1980, 112 Cal.App.3d 11, 169 Cal. Rptr. 263; *People v. Nagdeman,* 1980, 110 Cal. App.3d 404, 168 Cal.Rptr. 16; *People v. Evans,* 1977, 65 Cal.App.3d 924, 134 Cal.Rptr. 436; *People v. Williams,* 1975, 51 Cal.App.3d 346, 124 Cal.Rptr. 253; *State v. Mosier,* Fla.App. 1981, 392 So.2d 602; *State v. Goodley,* Fla.App. 1980, 381 So.2d 1180; *Mata v. State,* Fla.App. 1980, 380 So.2d 1157 (per curiam), *petition for review denied,* Fla., 389 So.2d 1112; *People v. Campbell,* 1977, 67 Ill.2d 308, 10 Ill.Dec. 340, 367 N.E.2d 949, *cert. denied,* 1978, 435 U.S. 942, 98 S.Ct. 1521, 55 L.Ed.2d 538; *People v. Price,* 1981, 54 N.Y.2d 557, 446 N.Y.S.2d 906, 431 N.E.2d 267; *State v. Rogers,* 1979, 43 N.C. App. 475, 259 S.E.2d 572; *State v. Elkins,* 1976, 47 Ohio App.2d 307, 354 N.E.2d 716; *State v. Wolohan,* 1979, 23 Wash.App. 813, 598 P.2d 421.

4. *See, e.g., United States v. Goldstein,* 5 Cir. 1981, 635 F.2d 356, *cert. denied,* 452 U.S. 962, 101 S.Ct. 3111, 69 L.Ed.2d 972; *United States v. Sullivan,* 4 Cir. 1980, 625 F.2d 69, *cert. denied,* 1981, 450 U.S. 923, 101 S.Ct. 1374, 67 L.Ed.2d 352; *United States v. Bronstein,* 2 Cir. 1975, 521 F.2d 459; *People v. Denman,* 1980, 112 Cal.App.3d 1003, 169 Cal.Rptr. 742.

shipped packages,[5] storage locker,[6] trailer,[7] or car[8] of the individual.[9] The theory of these cases, however, is not at all clear. The majority view is that the sniffing of the dog is not a search. *See, e.g., United States v. Bronstein*, 2 Cir. 1975, 521 F.2d 459; *United States v. Fulero*, D.C.Cir.1974, 498 F.2d 748; *State v. Goodley*, Fla.App. 1980, 381 So.2d 1180, 1182. *But see, e.g., People v. Williams*, 1975, 51 Cal.App.3d 346, 124 Cal.Rptr. 253; *People v. Price*, 1981, 54 N.Y.2d 557, 446 N.Y.S.2d 906, 431 N.E.2d 267 (Meyer, J., concurring); *State v. Elkins*, 1976, 47 Ohio App.2d 307, 354 N.E.2d 716, 718; *cf. People v. Campbell*, 1977, 67 Ill.2d 308, 10 Ill.Dec. 340, 367 N.E.2d 949 (characterization as "search" is not significant; the question is whether the investigation is reasonable), *cert. denied*, 1978, 435 U.S. 942, 98 S.Ct. 1521, 55 L.Ed.2d 538. In reaching that conclusion, however, many of the leading cases explicitly rely on the existence of some basis for suspicion, less than probable cause, before the police brought in their canine assistants. *See, e.g., United States v. Bronstein*, 2 Cir. 1975, 521 F.2d 459, 463; *id.* at 465 (Mansfield, J., concurring); *United States v. Sullivan*, 4 Cir. 1980, 625 F.2d 9, 11–12, *cert. denied*, 1981, 450 U.S. 923, 101 S.Ct. 1374, 67 L.Ed.2d 352; *United States v. Klein*, 7 Cir. 1980, 626 F.2d 22 ("This is not a case in which we need confront the thorny problem of an indiscriminate, dragnet-type sniffing expedition."); *see also State v. Goodley*, Fla.App.1980, 381 So.2d 1180, 1182 n.3. Almost without exception, even in those cases in which the court does not condition its holding on the existence of a reasonable suspicion, either the court concludes that there was, or the facts of the case reveal the existence of, some level of reasonable, individualized suspicion.[10] *See, e.g., United States v. Viera*, 5 Cir. 1981, 644 F.2d 509, *cert. denied*, 454 U.S. 867, 102 S.Ct. 332, 70 L.Ed.2d 169; *United States v. Fulero*, D.C.Cir.1974, 498 F.2d 748; *State v. Mosier*, Fla.App.1981, 392 So.2d 602; *People v. Price*, 54 N.Y.2d 557, 446 N.Y.S.2d 906, 431 N.E.2d 267.[11]

5. *State v. Elkins*, 1976, 47 Ohio App.2d 307, 354 N.E.2d 716.

6. *United States v. Venema*, 10 Cir. 1977, 563 F.2d 1003; *State v. Quatsling*, 1975, 24 Ariz. App. 105, 536 P.2d 226, *cert. denied*, 1976, 424 U.S. 945, 96 S.Ct. 1416, 47 L.Ed.2d 352.

7. *United States v. Solis*, 9 Cir. 1976, 536 F.2d 880.

8. *State v. Martinez*, 1976, 26 Ariz.App. 210, 547 P.2d 62, *op. adopted*, 113 Ariz. 345, 554 P.2d 1272.

9. All the cases cited in note 3, with the exception of *United States v. Burns*, 10 Cir. 1980, 624 F.2d 95, *cert. denied*, 449 U.S. 954, 101 S.Ct. 361, 66 L.Ed.2d 219, involved unattended property. *Burns* involved a sniffing investigation incident to a valid arrest, so the evidence was admissible regardless of whether the sniffing qualified as a search. Thus the decided cases do not govern the sniffing of attended property or of persons.

10. Some cases permit dragnet canine sniffing for reasons largely unrelated to the use of dogs. For instance, in *People v. St. George Matthews*, 1980, 112 Cal.App.3d 11, 169 Cal.Rptr. 263, a dog was permitted to sniff a number of cars being imported into the United States. Although the California decisions clearly prohibit dragnet sniffing in ordinary circumstances, *see, e.g., People v. Evans*, 1977, 65 Cal.App.3d 924, 134 Cal.Rptr. 436, the court upheld this operation because an unintrusive customs search in a border area does not require even reasonable suspicion. *St. George Matthews*, 169 Cal.Rptr. at 267. Also probably within this category is *United States v. Race*, 1 Cir. 1976, 529 F.2d 12. There, a customs agent used a dog in a routine inspection of a warehouse containing commingled domestic and international freight. The court discussed the constitutional validity of this procedure only briefly, in a footnote. Citing *Fulero* and *Bronstein*, which held that sniffing does not constitute a search, the court concluded that there was "no fourth amendment issue in the use of a dog for a routine check of comingled [sic] international and domestic freight in an airport warehouse". *Id.* at 14 n.2. *See Jones v. Latexo Independent School District*, E.D.Tex.1980, 499 F.Supp. 223, 235 n.11 (distinguishing *Race* as a customs search); *People v. Mayberry*, Cal.App.1981, 172 Cal. Rptr. 629, 631, *hearing granted*, Cal. (same). These cases, then, do not uphold dragnet canine sniffing except in situations in which any relatively unintrusive dragnet search would be permissible.

11. In particular, all of the federal cases cited in note 2 show some degree of individualized suspicion, with the exception of the customs search in *Race, see* note 10, and possibly *United States v. Johnson*, 2 Cir. 1981, 660 F.2d 21. In *Johnson*, the court's brief opinion does not

The problem with these cases, of course, is that if canine sniffing truly is not a search within the fourth amendment, it is constitutionally irrelevant whether there is any basis for suspicion of the individual searched. *See State v. Morrow,* 1981, 128 Ariz. 309, 625 P.2d 898, 902; *see generally* Amsterdam, *Perspectives on the Fourth Amendment,* 58 U.Minn.L.Rev. 349, 388 (1974). To detect something in "open view", the police officer need have no probable or reasonable cause or even a particularized suspicion. Thus it is difficult to square the holding that canine sniffing is not a search with the reliance on the existence of some level of individualized suspicion. Given that theoretical inconsistency, the dragnet sniffing case now before us could be resolved either way—in relying on precedent, we could focus either on the requirement of grounds for suspicion or on the statement that canine sniffing is not a search. Unsurprisingly, the three states that have decided the issue of dragnet canine sniffing have split. California uniformly holds dragnet sniffing unconstitutional, *People v. Mayberry,* Cal.App.1981, 172 Cal.Rptr. 629, *hearing granted,* Cal.; *People v. Evans,* 1977, 65 Cal.App.3d 924, 134 Cal.Rptr. 436; *People v. Williams,* 1975, 51 Cal.App.3d 346, 124 Cal.Rptr. 253. Arizona and Washington, on the other hand, have upheld such investigations. *State v. Morrow,* 1981, 128 Ariz. 309, 625 P.2d 898; *State v. Wolohan,* 1979, 23 Wash.App. 813, 598 P.2d 421. In the face of this confusion,[12] we are hesitant to extend the rule that canine sniffing is not a search to dragnet sniffing operations[13] simply on the basis of precedent. Instead, we must analyze

explain whether the police suspected criminal activity before they employed a dog to sniff the defendant's luggage. It does, however, state that the search warrant later obtained to open the luggage was based on a variety of factors including the dog's reaction, suggesting that there were grounds for suspicion before the sniffing. Even if *Johnson* did not involve prior grounds for suspicion, we would be hesitant to rely on that opinion as a rejection of the limitations in the holdings of the leading cases, for it cites the cases requiring some reasonable suspicion but does not explicitly reject the requirement.

Also, neither of the cases binding upon us involved dragnet searches. *United States v. Viera,* 5 Cir. 1981, 644 F.2d 509, *cert. denied,* 454 U.S. 867, 102 S.Ct. 332, 70 L.Ed.2d 169; *United States v. Goldstein,* 5 Cir.1981, 635 F.2d 356, *cert. denied,* 452 U.S. 962, 101 S.Ct. 3111, 69 L.Ed.2d 972. Although *Goldstein* explicitly refuses to require the "reasonable articulable suspicion" that is required for a "stop", *Reid v. Georgia,* 1980, 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (per curiam); *Terry v. Ohio,* 1968, 392 U.S. 1, 88 S.Ct. 1868, 1869, 20 L.Ed.2d 889, it does describe a sequence of events that gave the law enforcement officials individualized grounds for suspicion and states that those events "probably meet the reasonable suspicion standard". *Id.* at 362 n.10. *But cf. id.* at 361 (a subset of the events alone did not meet the reasonable suspicion standard). Similarly, the officials in *Viera* had some individualized grounds for suspicion. Thus neither panel was confronted with the problem of general exploratory searches with no individualized grounds—meeting the *Terry* standard or not— that have been "the source of so much justified concern", *State v. Goodley,* Fla.App.1980, 381 So.2d 1180, 1182 n.3.

**12.** The commentators seem unanimous in viewing canine sniffing as a search. *See* 1 W. LaFave, Search and Seizure § 2.2(f) at 282 n.166, 283, Supp. 51 n.185 (1978 & Supp.1982) (describing *Wolohan* as an "outrageous" result); Peebles, *The Uninvited Canine Nose and the Right to Privacy: Some Thoughts on* Katz *and Dogs,* 11 Ga.L.Rev. 75 (1976); Comment, *Search and Seizure in the Public Schools: Are Our Children's Rights Going to the Dogs?* 24 St. Louis U.L.J. 119 (1979); Note, *Police Use of Sense-Enhancing Devices and the Limits of the Fourth Amendment* 1977, U.Ill.L.F. 1167, 1197– 1201; Note, *Constitutional Limitations on the Use of Canines to Detect Evidence of Crime,* 44 Fordham L.Rev. 973 (1976). One article is a bit more equivocal when property is concerned but concludes that sniffing of persons is a search. Gardner, *Sniffing for Drugs in the Classroom— Perspectives on Fourth Amendment Scope,* 74 Nw.U.L.Rev. 803 (1980).

**13.** We reject the opinion expressed in *Doe v. Renfrow* that the knowledge of a drug problem in the schools is equivalent to the grounds for suspicion in the earlier cases—in effect, that the search in *Doe* and the search here are not dragnet searches. 475 F.Supp. at 1021. If the knowledge of the existence of a drug problem did suffice, the knowledge that dealers use luggage checked with airlines to transport drugs would justify sniffing all checked luggage. But that is exactly the dragnet search that the courts sought to avoid. The prior cases required grounds for suspecting the individual whose luggage was sniffed.

the problem afresh and determine whether the sniffing offends reasonable expectations of privacy, *Katz v. United States,* 1967, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576.

Both the general characteristics of a canine sniffing investigation and the specific features of the object of the investigation— car, locker, or person—are relevant in determining the constitutionality of the search.[14] The argument raised most frequently against viewing canine sniffing as a search is that a person has no legitimate expectation of privacy in the air surrounding his property. *See, e.g., United States v. Goldstein,* 5 Cir. 1981, 635 F.2d 356, *cert. denied,* 452 U.S. 962, 101 S.Ct. 3111, 69 L.Ed.2d 972; *United States v. Solis,* 9 Cir. 1976, 536 F.2d 880; *State v. Morrow,* 1981, 128 Ariz. 309, 625 P.2d 898; *State v. Goodley,* Fla.App.1980, 381 So.2d 1180; *People v. Price,* 1981, 54 N.Y.2d 557, 446 N.Y.S.2d 906, 431 N.E.2d 267; *State v. Wolohan,* 23 Wash.App. 813, 598 P.2d 421; *see also* 1 W. LaFave, Search and Seizure § 2.2(f) at 283 (1978) (rejecting argument); Note, *Constitutional Limitations on the Use of Canines to Detect Evidence of Crime,* 44 Fordham L.Rev. 973, 986–88 (1976) (same). If a police officer, positioned in a place where he has a right to be, is conscious of an odor, say, of marijuana, no search has occurred; the aroma emanating from the property or person is considered exposed to the public "view" and, therefore, unprotected, *Katz v. United States,* 1967, 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576, 582. *See United States v. Ventresca,* 1965, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (implicit); *United States v. Rivera,* 5 Cir. 1979, 595 F.2d 1095, 1098–99 (implicit); *see generally,* 1 W. La-Fave, Search and Seizure § 2.2(a) (1978). From this proposition courts have concluded that the sniffing of a dog is "no differ-

ent"[15] or that the dog's olfactory sense merely "enhances" that of the police officer in the same way that a flashlight enhances the officer's sight.[16]

■ We find this reasoning unpersuasive. The sniffing of a dog is unquestionably "different" from the sniffing of a human being; otherwise a rational law enforcement agency would not invest resources in training the animals but would simply send the handlers to sniff. The trained dogs— occasionally described as "giant olfactory nerve[s]"[17]—detect odors well outside the range of human senses. Nor do we think that the distinction between "enhancement" and "replacement" resolves the question: a dog's olfactory sense enhances that of the police officer in the same way that an electronic listening device, picking up sound waves in the air, enhances his hearing. The latter case, however, is clearly a search. Of course, the use of an aid to perception does not always render an investigation a "search". For instance, the use of a flashlight does not change an otherwise permissible visual scan into a search. *E.g., United States v. Lara,* 5 Cir. 1975, 517 F.2d 209, 211; Note, *Police Use of Sense-Enhancing Devices and the Limits of the Fourth Amendment* 1977, U.Ill.L.F. 1167, 1172–73, 1176. The proper way to determine whether the use of a given aid to perception renders an investigation a search, we think, is to consider both whether the aid permits an officer to detect data otherwise imperceptible to human senses and whether the aid is one generally in use in society. One should not be able to prevent an officer from using a more efficient means to detect what he could detect by using his own senses. For instance, if an officer can track two vehicles at once by

---

14. We reserve consideration of the special factors inherent in the school environment until Part IIB, below.

15. *See, e.g., United States v. Goldstein,* 5 Cir. 1981, 635 F.2d 356, *cert. denied,* 452 U.S. 962, 101 S.Ct. 3111, 69 L.Ed.2d 972; *United States v. Bronstein,* 2 Cir. 1975, 521 F.2d 459, 461; *People v. Campbell,* 1977, 67 Ill.2d 308, 10 Ill.

Dec. 340, 367 N.E.2d 949, 953, *cert. denied,* 98 S.Ct. 1521, 1978, 435 U.S. 942, 55 L.Ed.2d 538.

16. *See, e.g., United States v. Bronstein,* 2 Cir. 1975, 521 F.2d 459, 462 & n.3.

17. *Jones v. Latexo Independent School District,* E.D.Tex.1980, 499 F.Supp. 223, 232 n.7.

monitoring electronic beepers,[18] there is no constitutional right to require the police department to assign two officers to the task in order to restrict them to use of their unaided vision.[19] But the converse is not true: the individual's legitimate expectation of privacy does not extend to every datum imperceptible to unaided human senses, for life in society carries with it a significant risk that certain widely used sensory aids will reveal some otherwise imperceptible data. The flashlight is perhaps the most obvious example; it is widely used and socially accepted, so any activity that takes place in public darkness is subject to discovery with the aid of a flashlight, and, consequently, that discovery does not qualify as a "search". *See Jones v. Latexo Independent School District*, E.D.Tex.1980, 497 F.Supp. 223, 232 (dictum).

The application of these principles to the sniff of a drug-detecting dog suggests that there was a search in this case. The trained dog can detect odors that no human investigator could possibly perceive. And the use of such dogs is not widespread in society; we cannot say that the revelation of these undetectable odors is a concomitant of life in society.

In addition to these considerations, though, we must evaluate also the nature of the object of the investigation.[20] Here, the dogs sniffed lockers,[21] automobiles, and persons. The decided cases have frequently noted the lowered expectation of privacy in checked luggage: one turns it over to an airline, aware that it will be handled, weighed, visually inspected, and perhaps shaken by a number of airline employees. *United States v. Bronstein*, 2 Cir. 1975, 521 F.2d 459, 465 (Mansfield, J., concurring); *cf. United States v. Barry*, 6 Cir. 1982, 673 F.2d 912 (package entrusted to carrier). To a lesser extent, the result of leaving any property unattended in public is to lower one's expectation of privacy with respect to that property. In particular, cars are the subject of lowered expectations of privacy.

18. *United States v. Michael*, 5 Cir. 1981, 645 F.2d 252 (en banc), *cert. denied*, 454 U.S. 950, 102 S.Ct. 489, 70 L.Ed.2d 257.

19. *See United States v. Michael*, 5 Cir. 1981, 645 F.2d 252, 258 n.14 (en banc), *cert. denied*, 454 U.S. 950, 102 S.Ct. 489, 70 L.Ed.2d 257; *id.*, 645 F.2d at 259 (Clark, J., concurring).

Similarly, and closer to home, we do not think that it would be impermissible to use a dog to track a suspect. Although the human olfactory sense might not be sharp enough to pick up the scent, the investigators are not discovering data otherwise imperceptible to *all* human senses; human investigators could have traced the suspect's movements by following him, using unaided vision.

20. To this point, our discussion has focused on property, because the arguments have been raised in cases dealing with sniffing of property. *See* note 9. We see no reason why the open view concept, extended to "open smell", should not apply to persons. Consequently, the argument that a dog's sniff reveals only information subject to "open smell" should be applicable (or inapplicable) to persons just as it is to property.

21. The school district has not argued that it owns the lockers and permits the students to use them subject to a retained right of inspection. Although ownership alone does not determine the scope of fourth amendment protection, and announcements that privacy will not be respected do not, per se, preclude reasonable expectations of privacy, these factors can be relevant. Thus, in *Zamora v. Pomeroy*, 10 Cir. 1981, 639 F.2d 662, 670, the court viewed a student's locker as jointly possessed by the student and the school and upheld a search of the locker by school officials. And in *United States v. Venema*, 10 Cir. 1977, 563 F.2d 1003, the court held that the defendant had no reasonable expectation of privacy in a rented storage locker because the manager warned him that she would permit police dogs to sniff for drugs. At the same time, though, it is important to bear in mind that a locker is one of the few "harbors of privacy" permitted a student who is compelled to spend most of his day in a public school.

It is the only place where [the student] may be able to store what he seeks to preserve as private—letters from a girl friend, applications for a job, poetry he is writing, books that may be ridiculed because they are too simple or too advanced, or dancing shoes he may be embarrassed to own.

Buss, *The Fourth Amendment and Searches of Students in Public Schools*, 59 Iowa L.Rev. 739, 772–73 (1974). That factor, along with the common practice of assigning each student exclusive use of a locker and treating it as his dominion and responsibility, we think, gives the student a reasonable expectation of *some* privacy in the contents of his locker.

479

E.g., Cardwell v. Lewis, 1974, 417 U.S. 583, 590–91, 94 S.Ct. 2464, 2469–2470, 41 L.Ed.2d 325, 335 (plurality opinion), quoted in United States v. Chadwick, 1977, 433 U.S. 1, 12, 97 S.Ct. 2476, 2484, 53 L.Ed.2d 538, 549. Certain minimal intrusions, though perhaps not expected, cannot be completely unexpected.[22] Nor are they intolerable. But the run of the mill intrusion does not reveal much information and certainly would not reveal the scent of one seed of marijuana, as would the sniff of the trained dog. We conclude that the intrusion on the cars and lockers here is different from those acceptable and unremarkable intrusions and must be recognized as a search governed by the fourth amendment.[23] Accord, e.g., United States v. Bronstein, 2 Cir. 1975, 521 F.2d 459, 464–65 (Mansfield, J., concurring); People v. Mayberry, Cal.App.1981, 172 Cal. Rptr. 629, hearing granted, Cal.; State v. Elkins, 1976, 47 Ohio App.2d 307, 354

N.E.2d 716. See generally articles cited in note 12, supra.

The use of the dogs to sniff the students presents an even clearer instance of a search within the fourth amendment. The students' persons certainly are not the subject of lowered expectations of privacy. On the contrary, society recognizes the interest in the integrity of one's person, and the fourth amendment applies with its fullest vigor against any indecent or indelicate intrusion on the human body.[24] See, e.g., Schmerber v. California, 1966, 384 U.S. 757, 769–70, 86 S.Ct. 1826, 1835–1836, 16 L.Ed.2d 908, 919; see generally Gardner, Sniffing for Drugs in the Classroom—Perspectives on Fourth Amendment Scope, 74 Nw.U.L. Rev. 803, 848 (1980); cf. Rochin v. California, 1952, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (fifth amendment).[25] Ours is a society that would not tolerate the widespread use of dogs in dragnet sniffing of

**22.** Cf. United States v. Viera, 5 Cir. 1981, 644 F.2d 509, 510 (minimal intrusion involved in "prepping" a bag—pressing it and circulating the air to obtain a scent—is not a search), cert. denied, 454 U.S. 867, 102 S.Ct. 332, 70 L.Ed.2d 169.

**23.** In holding that canine sniffing is not a search, courts frequently note that the search is a minimal intrusion because the use of the dogs discriminates among types of information, and any error is in favor of the suspect. The handler discovers only whether the object contains contraband, unlike one who examines the contents of a container visually and views all innocent possessions as well as any contraband. That consideration ought to relate not to the categorization of the procedure as a "search" but to the reasonableness of the search. See Part IIB, below. At any rate, on this record, that consideration simply is not present. The defendant has introduced no evidence of the reliability of the dogs, while the plaintiff has shown two instances in which the error was in favor of further searches rather than in favor of the suspect. In addition, it is conceded that the dogs in this case alert to some sixty substances including anything that, like the bottle of perfume in Sandra Sanchez's purse, contains alcohol. The handlers, therefore, obtain information about innocent possessions as well as about violations of school policy.

**24.** The record contains evidence that the dogs put their noses "up against" the objects or persons they are investigating. Newman Depo. at 43. We therefore reject the school district's

suggestion that the record shows no physical contact between the dogs and the students. In any event, physical trespass is no longer the key to distinguishing searches from nonsearches, Katz v. United States, 1967, 389 U.S. 347, 353, 88 S.Ct. 507, 512, 19 L.Ed.2d 576. Our textual discussion demonstrates that the dogs certainly came close enough to offend the students' interest in freedom from indecent intrusions and that the use of the dogs revealed information that the school officials could not have received through the use of human senses and that the students could have reasonably expected to keep private.

**25.** This result accords fully with all the precedent on canine sniffing except Doe v. Renfrow. Every other case concerned unattended property, see note 9, and courts frequently gave as one reason in favor of categorizing sniffing as a non-search that "[t]he invasion of privacy is not aimed at the person but rather his luggage. Thus, the scope of the intrusion is minimal, restrictive and tolerable by society." Mata v. State, Fla.App.1980, 380 So.2d 1157, 1159 (per curiam), petition for review denied, Fla., 389 So.2d 1112; see, e.g., United States v. Klein, 7 Cir. 1980, 626 F.2d 22, 26; cf. State v. Wolohan, 1979, 23 Wash.App. 813, 598 P.2d 421, 425 n.5 (expressing grave doubt as to whether sniffing of attended luggage is, like sniffing of unattended luggage, not a search); see generally, Note, Constitutional Limitations on the Use of Canines to Detect Evidence of Crime, 44 Fordham L.Rev. 973, 986 (1976).

property;[26] even less is it a society that would tolerate the use of dogs in dragnet intrusions into the physical integrity of our people, unrestrained by the fourth amendment.

Our decision that the procedures employed by GCISD constitute searches does not, however, compel the conclusion that they were constitutionally impermissible. The fourth amendment does not prohibit all searches; it only restricts the government to "reasonable" searches. The reasonableness of these procedures turns partly on the school environment, to be discussed in Part IIB. But the reasonableness is also governed in part by general fourth amendment principles.

The body of case law on canine sniffing is best described as the implicit recognition by the courts of a new category under the fourth amendment—the "limited search", similar to that recognized by the Supreme Court in *Terry v. Ohio*, 1968, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889.[27] In *Terry*, the Court upheld a warrantless "stop and frisk" on the basis of a suspicion that fell short of probable cause. Confronted with a choice between subjecting a useful and, indeed, virtually indispensable, tool for both the protection of law enforcement officers and the prevention of crime to a requirement of probable cause and a warrant or of giving the police unbridled discretion to stop and

frisk citizens, the Court rejected this monolithic, "all-or-nothing" view of the fourth amendment. Instead, it recognized a new category of search and seizure—the minimally intrusive stop and frisk—that could be conducted upon a finding of reasonable cause. Since the circumstances in which a stop and frisk is used preclude obtaining a warrant, the procedure is exempt from the warrant requirement.

■ Although we recognize significant drawbacks to the adoption of a "sliding scale" approach to fourth amendment analysis,[28] we cannot ignore the vast body of precedent denying the full array of fourth amendment safeguards in canine sniffing cases. And we think that canine sniffing of property, like the stop and frisk of *Terry*, is a good candidate for inclusion in the category of "limited searches". It is minimally intrusive, involving no inconvenience or humiliation. Indeed, it is probably less intrusive than a frisk, which is aimed at a person rather than at property. And it provides the police with only very limited information about the suspect.[29] The information is nevertheless of great value, for it aids in the detection of otherwise easily hidden contraband. Under the balancing procedure of *Terry*, when there is some level of articulable individualized suspicion, we think that the need for the search out-

---

**26.** *See* 1 W. LaFave, Search and Seizure § 2.2(f) at 286 (1978).

**27.** Several commentators have explained the cases in this way. *See* 1 W. LaFave, Search and Seizure § 2.2(f) at 288 (1978); Peebles, *The Uninvited Canine Nose and the Right to Privacy: Some Thoughts on Katz and Dogs*, 11 Ga.L. Rev. 75 (1976); Note, *Constitutional Limitations on the Use of Canines to Detect Evidence of Crime*, 44 Fordham L.Rev. 973 (1976); Note, *Police Use of Sense-Enhancing Devices and the Limits of the Fourth Amendment*, 1977 U.Ill. L.F. 1167, 1168–69, 1201. A few cases have explicitly adopted the viewpoint that a canine sniff is a search but a reasonable one. *State v. Elkins*, 1976, 47 Ohio App.2d 307, 354 N.E.2d 716; *cf. People v. Campbell*, 1977, 67 Ill.2d 308, 10 Ill.Dec. 340, 367 N.E.2d 949 (important question is not whether sniff is a search but whether it is reasonable), *cert. denied*, 1978, 435 U.S. 942, 98 S.Ct. 1521, 55 L.Ed.2d 538; *State v. Goodley*, Fla.App.1980, 381 So.2d 1180, 1182

n.3 (assuming a sniff is a search, this one was reasonable); *see also United States v. Bronstein*, 2 Cir. 1975, 521 F.2d 459, 464–65 (Mansfield, J., concurring).

**28.** *See generally* Amsterdam, *Perspectives on the Fourth Amendment*, 58 U.Minn.L.Rev. 349, 388–95 (1974); Peebles, *The Uninvited Nose and the Right to Privacy: Some Thoughts on Katz and Dogs*, 11 Ga.L.Rev. 75, 103–04 (1976).

**29.** In most cases, the record has established that the dogs are overwhelmingly correct and that any errors favor the suspect. In this case, there is no evidence of reliability, and, since the dogs alert handlers to some sixty substances, including innocent substances, the information obtained by the handlers is not as limited. *See* note 23. Nonetheless, the handlers obtain much less information than is revealed by a visual examination.

weighs the intrusiveness, and canine sniffing of property is a reasonable procedure under the fourth amendment.[30] When there is no individualized suspicion, though, the balance tips in the opposite direction. The intrusiveness of the search is unchanged, but the justification is diminished, if not eliminated. When there is *no* reason to believe that a search will produce evidence of crime, beyond the knowledge that some people are criminals and that searching everyone's property will identify the criminal few, the Constitution does not tolerate intrusions on protected privacy, even when those intrusions are only "limited searches".

Similarly, when the object of the search is a person, the balance permits the search only if there is a reasonable suspicion.[31] When a dog inspects the human body, we cannot ignore the indignity inflicted upon the person. Yet the indignity is no more than that inflicted by a frisk. Consequently, the intrusion may be permissible when justified by reasonable cause. Again, though, when there is no individualized cause to justify the sniffing, the Constitution prohibits the intrusion.

The preceding discussion, however, does not resolve the case currently before us. We have established that dragnet searches of persons and property by sniffing dogs are ordinarily prohibited. But the fourth amendment does not always require the same results in the schools as it does in ordinary circumstances. As a result, we must consider the extent to which the public school setting affects fourth amendment analysis.

### B. The Fourth Amendment in the Public Schools

The courts have encountered substantial difficulty in accommodating the fourth amendment to the special situation presented by the public schools, where school officials have both a right and a duty to provide a safe environment conducive to education. At one time, it was not uncommon for a court to view the school official who searched a student as acting under authority derived from the parent and therefore as a private party not subject to the constraints of the fourth amendment. *See, e.g., Mercer v. State*, Tex.Civ.App.—Austin 1970, 450 S.W.2d 715; *see generally* Buss, *The Fourth Amendment and Searches of Students in Public Schools*, 59 Iowa L.Rev. 739, 765–67 (1974); Comment, *Search and Seizure in Public Schools: Are Our Children's Rights Going to the Dogs?* 24 St. Louis U.L.J. 119, 127 (1979). As courts in most recent cases have decided, we think it beyond question that the school official, employed and paid by the state and supervising children who are, for the most part, compelled to attend,[32] is an agent of the government and is constrained by the fourth amendment. *Accord, Bellnier v. Lund*, N.D.N.Y.1977, 438 F.Supp. 47; *State v. Baccino*, Del.Super.1971, 282 A.2d 869; *State v. Young*, 1975, 234 Ga. 488, 216 S.E.2d 586, *cert. denied*, 423 U.S. 1039, 96 S.Ct. 576, 46 L.Ed.2d 413; *People v. Scott D.*, 1974, 34 N.Y.2d 483, 358 N.Y.S.2d 403, 315 N.E.2d 466. The Supreme Court's application to school officials of other constitutional restraints applicable only to state action compels that result. *See, e.g., Tinker v. Des Moines Independent Community School District*, 1969, 393 U.S. 503, 89 S.Ct.

---

**30.** It is in this sense that the use of dogs is a commendable, intelligent, and responsible police procedure. *See United States v. Fulero*, D.C.Cir.1974, 498 F.2d 748, 749; *State v. Elkins*, 1976, 47 Ohio App.2d 307, 354 N.E.2d 716, 720.

**31.** We view this requirement as more stringent than the requirement for sniffing of property, for the search is more intrusive. The requirement stated here is the "reasonable cause" standard of *Terry.* 392 U.S. at 21–22, 88 S.Ct. at 1879–1880, 20 L.Ed.2d at 906. *See also Reid*

*v. Georgia*, 1980, 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890.

**32.** Tex.Educ. Code Ann. § 21.032 (Vernon Supp. 1982). Given the public interest in encouraging noncompulsory secondary education and the social pressures to remain in school, as well as the difficulty of applying different standards to the 17- and 18-year-olds in the public school system, our discussion applies equally to those students not legally compelled to attend school.

733, 21 L.Ed.2d 731; *Goss v. Lopez*, 1975, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725; *West Virginia State Board of Education v. Barnette*, 1943, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628.

█ But the decision that school officials are governed by the fourth amendment does not dictate a holding that their activity in this case was unconstitutional. The basic concern of the fourth amendment is reasonableness,[33] and reasonableness depends on the circumstances. Often the ordinary requirements of the fourth amendment are modified to deal with special situations. *See, e.g., Terry v. Ohio*, 1968, 392 U.S. 1, 19, 88 S.Ct. 1868, 1878–1879, 20 L.Ed.2d 889, 904; *Marshall v. Barlow's, Inc.*, 1978, 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (administrative search); *Camara v. Municipal Court*, 1967, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (same); *United States v. Skipwith*, 5 Cir. 1973, 482 F.2d 1272 (airport search to prevent air piracy); *Henderson v. United States*, 9 Cir. 1967, 390 F.2d 805, 808 (border search); *United States v. Coles*, D.Me.1969, 302 F.Supp. 99 (search of corpsman's property at Civilian Conservation Center as part of supervisory power of administrative officer). The public school presents special circumstances that demand similar accommodations of the usual fourth amendment requirements. When society requires large groups of students, too young to be considered capable of mature restraint in their use of illegal substances or dangerous instrumentalities, to congregate in the public schools, it assumes a duty to protect them from dangers posed by anti-social activities—their own and those of other students—and to provide them with an environment in which education is possible. To fulfill that duty, teachers and school administrators must have broad supervisory and disciplinary powers.[34] At the same time, though, we must protect the fourth amendment rights of students. Indeed, constitutional rights in the schools take on a special importance. "That [the schools] are educating the young for citizenship is reason for scrupulous protection of constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes." *West Virginia State Board of Education v. Barnette*, 1943, 319 U.S. 624, 637, 63 S.Ct. 1178, 1185, 87 L.Ed. 1628, 1637.

**33.** *Terry v. Ohio*, 1968, 392 U.S. 1, 19, 88 S.Ct. 1868, 1878–1879, 20 L.Ed.2d 889, 904.

**34.** Courts usually refer to the basis of these powers as the *in loco parentis* doctrine. Under that doctrine, parents were viewed as ceding their parental powers over and duties to protect the best interests of a child to the school official, who then could act toward the child in any way that the parent could, exercising the same disciplinary and supervisory powers. Although the courts no longer view this doctrine as making the official effectively a private party, they still explain the broad powers of the school official as derived from his *in loco parentis* duties. We cannot accept this view. The law recognizes broad powers in a parent in part because one can safely assume that the parent will exercise those powers in the best interests of the child. The school administrator's duties, however, are not always exercised with only the child who is being disciplined or searched in mind. On the contrary, the school official must bear in mind the interests of all the students committed to his supervision and frequently actions toward one child will be taken to protect other children from him. To that extent, it no longer makes sense to view the school official as the equivalent of a parent.

See generally *State v. Mercer*, Tex.Civ.App.—Austin 1970, 450 S.W.2d 715, 720–21 (Hughes, J., dissenting); Buss, *The Fourth Amendment and Searches of Students in Public Schools*, 59 Iowa L.Rev. 739, 768 (1974); *cf. State v. Young*, 1975, 234 Ga. 488, 216 S.E.2d 586, 592 (school owes students forced to associate with others a safe environment), *cert. denied*, 423 U.S. 1039, 96 S.Ct. 576, 46 L.Ed.2d 413. Moreover, in a compulsory education system, *see* note 32, the parent does not voluntarily yield his authority over the child to the school, so the concept of delegated authority is of little use. See generally *Ingraham v. Wright*, 1977, 430 U.S. 651, 662, 97 S.Ct. 1401, 51 L.Ed.2d 711; *State v. Young*, 216 S.E.2d at 592; Gardner, *Sniffing for Drugs in the Classroom—Perspectives on Fourth Amendment Scope*, 74 Nw.U.L. Rev. 803, 821 (1980). We agree with most courts that school officials have special duties with associated powers, but we prefer not to tie them to the *in loco parentis* doctrine. Instead we view the school as presenting a special situation, in the same way that the border or an airport presents a special situation, requiring the courts to allow some intrusions on otherwise protected privacy.

When the school official acts in furtherance of his duty to maintain a safe environment conducive to education,[35] the usual accommodation is to require that the school official have "reasonable cause" for his action. Although the standard is less stringent than that applicable to law enforcement officers, it requires more of the school official than good faith or minimal restraint. The Constitution does not permit good intentions to justify objectively outrageous intrusions on student privacy.[36] See, e.g., Bellnier v. Lund, N.D.N.Y.1977, 438 F.Supp. 47, 53; M. v. Board of Education, S.D.Ill.1977, 429 F.Supp. 288, 292; State v. Baccino, Del.Super.1971, 282 A.2d 869, 872; Nelson v. State, Fla.App.1975, 319 So.2d 154. See generally Terry v. Ohio, 1968, 392 U.S. 1, 22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889, 906. Contra, State v. Young, 1975, 234 Ga. 488, 216 S.E.2d 586, cert. denied, 423 U.S. 1039, 96 S.Ct. 576, 46 L.Ed.2d 413. Thus, though we do not question the good faith of the GCISD officials in their attempt to eradicate a serious and menacing drug and alcohol abuse problem, we cannot approve the program on that basis; we must examine its objective reasonableness.

At least one case has held that the reasonable cause standard applicable in the schools requires individualized suspicion. Bellnier v. Lund, N.D.N.Y.1977, 438 F.Supp. 47. There, a teacher had reason to believe that someone in her class of fifth graders had stolen three dollars, but she had no reason to suspect any particular pupil. When a search of the coats and coatroom revealed nothing, the teacher and principal required each pupil to remove his shoes and empty his pockets. The two officials then required each student to step into the washroom and strip to his undergarments. The court held the search unconstitutional, requiring the existence of facts giving the official reasonable particularized suspicions as a predicate for a search. Accord, People v. Scott D., 1974, 34 N.Y.2d 483, 358 N.Y. S.2d 403, 407 (dictum). The result in Bellnier is unquestionably correct, but we do not think that it requires a blanket rule that school searches are never reasonable without individualized suspicion. In some circumstances, the seriousness of the threat to safety or the limited nature of the intrusion may render a dragnet school search a reasonable means of dealing with a problem.[37]

**35.** We intimate no opinion as to the standards to be applied when a school official acts at the request of the police, calls in the police before searching, or turns over the fruits of his search to the police. In that situation, when there is some component of law enforcement activity in the school official's actions, the considerations may be critically different. See, e.g., Picha v. Wielgos, N.D.Ill.1976, 410 F.Supp. 1214, 1219–21; State v. Mora, La.1975, 307 So.2d 317, vacated, 423 U.S. 809, 96 S.Ct. 20, 46 L.Ed.2d 29, same result reached on reconsideration, La. 1976, 330 So.2d 900, cert. denied, 429 U.S. 1004, 97 S.Ct. 538, 50 L.Ed.2d 616.

**36.** Contra, Stern v. New Haven Community Schools, E.D.Mich.1981, 529 F.Supp. 31. The Stern result illustrates the dangers of focusing on good intentions, for there the court approved the use of a two-way mirror in a boys' washroom.

**37.** We recognize that this statement leaves the fourth amendment a sliding scale in the public schools. Although a sliding scale approach has definite advantages in permitting the accommodation of all the interests in conflict in any situation, it does "convert[ ] the fourth amendment into one immense Rohrschach blot", leaving government officials and the courts with little guidance and tempting courts to defer to discretionary exercises of power by school officials. Amsterdam, Perspectives on the Fourth Amendment, 58 U.Minn.L.Rev. 349, 393 (1974); see generally id. at 388–95. But these waters are not uncharted, and we think it too late to re-map them. The courts have established that reasonableness in the schools is to be a function of all the circumstances, including the seriousness of the problem, the age of the child, the child's disciplinary history, and the intrusiveness of the search. See, e.g., M.M. v. Anker, 2 Cir. 1979, 607 F.2d 588 (per curiam); Bilbrey v. Brown, D.Or.1979, 481 F.Supp. 26; M. v. Bd. of Educ., S.D.Ill.1977, 429 F.Supp. 288; Bellnier v. Lund, N.D.N.Y.1977, 438 F.Supp. 47. In the schools, the disadvantages of a sliding scale may not be as great as they would be elsewhere: teachers necessarily have a great deal of discretion over the control of their classrooms, and they serve as guardians of individual children in a way that policemen cannot serve as "guardians" of individual citizens. Further, we find some comfort in the knowledge that teachers do not have the same incentive to ferret out evidence of disciplinary infractions that police officers—whose professional reason for being is the discovery of crime—have to ferret out evidence of crime,

Indeed, relatively nonintrusive administrative searches outside the schools need not be justified by individualized suspicion, if there is sufficient suspicion of a violation somewhere in the area covered by the dragnet. *Marshall v. Barlow's, Inc.*, 1978, 436 U.S. 307, 320, 98 S.Ct. 1816, 1824, 56 L.Ed.2d 305, 316; *Camara v. Municipal Court*, 1967, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930; *See v. Seattle*, 1967, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943. Dragnet sniffing of lockers and cars, carried out for the administrative purpose of maintaining a safe school environment conducive to education, is similar to the administrative searches carried out to promote compliance with the Occupational Safety and Health Act and municipal housing and structural codes in *Barlow's, Camara,* and *See* and is, therefore, reasonable.

■ None of the administrative search cases, though, involved searches of persons, which entail a far greater invasion of privacy. In *Camara*, the Court explicitly noted as support for its decision that the search was not "personal in nature [and therefore] involve[d] a relatively limited invasion of the . . . citizen's privacy". 387 U.S. at 537, 87 S.Ct. at 1735. The analogy to the administrative searches, then, breaks down when we consider the dragnet sniffing of the children. In resolving that problem, we must consider the significant intrusion on dignity and personal security that goes with a canine inspection of the student's person. That aspect of the GCISD program entails too great an intrusion on the privacy of the students to be justified by the need to prevent abuse of drugs and alcohol when there is no individualized suspicion, and we hold it unconstitutional.

One hurdle remains to the validation of the dragnet sniffing of lockers and cars— the failure to obtain a warrant. The usual fourth amendment rule is that, even if supported by probable cause, a warrantless search is unreasonable, subject to a few well-delineated exceptions. *See, e.g., Katz v. United States*, 1967, 389 U.S. 347, 356–59, 88 S.Ct. 507, 514–15, 19 L.Ed.2d 576, 585–86. Those exceptions include border searches, searches incident to valid arrests, seizures of items in plain view, consent searches, and searches in exigent circumstances that preclude obtaining a warrant. The ordinary administrative search, even though not supported by individualized cause, also requires a warrant. The warrant serves a useful function because it assures the person whose property is to be searched that the official is authorized to search, alerts both the official and the citizen to the lawful limits of the search, and prevents discriminatory searches. *Barlow's*, 436 U.S. at 322–23, 98 S.Ct. at 1825; *Camara*, 387 U.S. at 532, 87 S.Ct. at 1732.

■ In the schools, however, as discussed above, blanket rules are of little use, for the proper inquiry is the overall reasonableness of the search.[38] In considering the reasonableness of warrantless sniffing, it is instructive to note that, in this circuit, a canine sniff of property based on some individualized suspicion does not require a warrant, even in the absence of exigent circumstances. *See United States v. Viera*, 5 Cir. 1981, 644 F.2d 509, *cert. denied,* 454 U.S. 867, 102 S.Ct. 332, 70 L.Ed.2d 169; *United States v. Goldstein*, 5 Cir. 1981, 635 F.2d 356, *cert. denied,* 452 U.S. 962, 101 S.Ct. 3111, 69 L.Ed.2d 972. Furthermore, we perceive little reason to anticipate that school officials will exceed the bounds of their authority or will use the procedure to harass individuals—if for no other reason, because the intrusion is so minimal that it would not be an effective harassment technique. The limited scope of the intrusion lends further support for excusing the warrant requirement. Consequently, we con-

---

*see Terry v. Ohio*, 1968, 392 U.S. 1, 12, 88 S.Ct. 1868, 1875, 20 L.Ed.2d 889, 900 (quoting *Johnson v. United States*, 1948, 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436, 440), so the likelihood of overzealous searches is reduced.

**38.** *Cf.* Amsterdam, *Perspectives on the Fourth Amendment,* 58 U.Minn.L.Rev. 349, 391 (1974) (sliding scale approach might permit warrantless intrusions in some cases).

clude that this searching technique is reasonable, even without a warrant.[39]

The plaintiffs urge that, even if the initial sniffing of the cars and lockers by the dogs is permissible, the dogs' reactions do not give the defendant a sufficiently strong basis for suspicion to justify a further search. The district court stated that the "generalized perception of a problem of drug and alcohol abuse" along with the positive reaction of the dog gave the school sufficient cause to believe that the student occupant or driver had violated school policy to justify opening the locker or car and searching it. The court did not, however, make any finding on the reliability of the dogs, and there was no evidence in the record to support such a finding. In fact, although the representative of the SAI asserted that the dogs were quite reliable, he admitted that there were no comprehensive records kept of those incidents when the dogs reacted positively in the absence of contraband. On this record, then, we cannot say whether the reaction of the dogs provided adequate cause for more intrusive searches, and summary judgment is inappropriate. Fed.R.Civ.P. 56(c). We remand to the district court for development of the record on that point. The standard enunciated by the district court, however, was proper: GCISD need not show that the dogs are infallible or even that they are reliable enough to give the defendant probable cause; instead, the dogs must be reasonably reliable.[40] If the school does have reasonable cause to suspect the presence of contraband, the ease with which it can be destroyed or moved presents an exigent circumstance that excuses the warrant requirement, e.g., United States v. Petty, 5 Cir. 1979, 601 F.2d 883, 890 (alternative holding), cert. denied, 1980, 445 U.S. 962, 100 S.Ct. 1649, 64 L.Ed.2d 237.

### III.

The plaintiffs also argue that the use of the dogs violates their rights under the fourteenth amendment, by depriving them of a liberty interest without due process. Because of our disposition of the fourth amendment issues arising out of the sniffing of the students, see Part II, we need not decide whether that practice entails a due process violation. The question remains whether the presence of a dog on campus and the practice of occasionally allowing him to play on campus, unrestrained by a leash but supervised by the handler, constitute a violation of the due process clause.

The dogs trained and provided by SAI are large animals—usually German shepherds and Doberman pinschers, and occasionally labradors—breeds selected because the animals are often sold to police forces, who wish to maintain an image of strength and ferocity. The individual animals, however, are selected on the basis of their docility, and SAI has never received a complaint about the dogs' injuring anyone in any way.[41] The defendant goes to considerable pains to educate the younger students, who are more likely to be frightened, by introducing the dogs at assemblies and demonstrating their friendliness. Furthermore,

---

**39.** Our holding is not be read broadly. More intrusive searches, and those presenting greater possibilities of abuse, will be subject to the warrant requirement. Accord, M.M. v. Anker, E.D.N.Y.1979, 477 F.Supp. 837, 844–45; State v. Mora, La.1975, 307 So.2d 317, vacated, 423 U.S. 809, 96 S.Ct. 20, 46 L.Ed.2d 29, same result on reconsideration, La.1976, 330 So.2d 900, cert. denied, 429 U.S. 1004, 97 S.Ct. 538, 50 L.Ed.2d 616. Contra, Bilbrey v. Brown, D.Ore.1979, 481 F.Supp. 26, 28 (dictum).

**40.** It will not, however, be enough to show that the dogs are reasonably reliable in indicating the presence or recent presence of contraband. If the reaction is to justify a search, it must give rise to reasonable suspicion that the search will produce something—i.e., reasonable suspicion that contraband is currently present.

**41.** According to the representative of SAI, one student was scratched slightly when he played with one of the dogs, but he did not register any complaint. One who chooses to play with a large dog assumes the risk of incurring minor scratches and bruises in the rough-and-tumble, and we think that the students can differentiate between an unprovoked attack and an incidental scratch. It is unlikely that such an incident contributes to the intimidation alleged by the plaintiffs.

there is nothing in the record to indicate that those students who do not wish to join in the play with the dogs cannot avoid them.[42]

We recognize that large dogs, particularly those breeds that are sometimes used as attack dogs, often engender an irrational fear, and we do question the wisdom of permitting them to roam parts of the campus unleashed. But, as long as the dogs are carefully selected for their nonaggressive character, and the handlers supervise them during their playtime, we do not think that the minimal "harassment" arising from their mere presence on campus rises to the level of a constitutional violation.[43]

## IV.

The plaintiffs sought to maintain a class action under rule 23, Fed.R.Civ.P., requesting the district court to certify a class of all students currently enrolled in GCISD schools. The defendant opposed class certification, and the district court refused to certify the class.

The decision to grant or to deny certification is, as the defendant contends, initially committed to the sound discretion of the district judge, and the decision will not be overturned except for abuse of discretion.

See, e.g., Doninger v. Pacific Northwest Bell, Inc., 9 Cir. 1977, 564 F.2d 1304, 1309; Gonzalez v. Southern Methodist University, 5 Cir. 1976, 536 F.2d 1071, cert. denied, 1977, 430 U.S. 987, 97 S.Ct. 1688, 52 L.Ed.2d 383; 7 C. Wright & A. Miller, Federal Practice and Procedure §§ 1759, 1765 (1972). Nonetheless, the discretion of the district judge is not without limits; he must bear in mind the impact of a binding judgment on class members and the functions of the class action in facilitating assertion of certain types of claims or defenses and in avoiding repetitious litigation. And while considering these factors, he must determine whether the case meets the four requirements of rule 23(a):

(1) The class must be so numerous that joinder of all members is impracticable;

(2) There must be questions of law or fact common to the class;

(3) The claims or defenses of the representative parties must be typical of the claims or defenses of the class; and

(4) The representative parties must fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). In addition, the action must fit within one of the categories of actions described in rule 23(b).

42. We reiterate that we leave undecided whether the use of the dogs to sniff the students themselves would be a deprivation of liberty or property without due process.

43. We have found no authority to the contrary, and the plaintiffs have cited none. The only cases cited by the plaintiffs deal with the possible existence of a liberty or property interest in the renewal of government employment and the possible existence of a liberty interest in one's reputation. Bd. of Regents v. Roth, 1972, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548; Wisconsin v. Constantineau, 1971, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515. Any humiliation arising from the use of the dogs is, we think, limited to the use of the dogs to sniff the persons, which we have invalidated on other grounds. The mere presence of the dogs on campus is in no way humiliating; nor does it stigmatize the students, so the cases cited are factually inapposite. Assuming that the plaintiffs intend to draw an analogy between their interest in freedom from intimidation and the interests at issue in Roth and Constantineau, we think that Paul v. Davis, 1976, 424 U.S. 693,

96 S.Ct. 1155, 47 L.Ed.2d 405, which cut back severely the holding of Constantineau, and Roth work against the plaintiffs. Both require something beyond injury to some interest of the plaintiff to establish a violation of the due process clause. Roth required a legitimate claim of entitlement from a nonconstitutional source, such as state law, to establish a protected property interest. Similarly, Davis required some change in legal status to make an injury to reputation a deprivation of a protected liberty interest, noting that the interests protected by the due process clause "attain this constitutional status by virtue of the fact that they have been initially recognized and protected by state law". 424 U.S. at 710, 96 S.Ct. at 1164, 47 L.Ed.2d at 419 (footnote omitted). The plaintiffs have not directed our attention to any state law entitlement protecting the interest they assert. Indeed, the record indicates that in Baytown, the site of most of GCISD, it is not a violation of the leash law for a dog to be off leash when supervised by a capable individual. See Newman Depo. at 64.

In this case, the district judge offered no explanation of his denial of certification, stating only that "bald assertions will not support the requirements of proof necessary to satisfy Rule 23(a)". Although an unexplained decision renders review difficult, it need not preclude affirmance if there are obvious reasons justifying the district court's decision. *See, e.g., Dussouy v. Gulf Coast Investment Corp.*, 5 Cir. 1981, 660 F.2d 594, 597; *Rhodes v. Amarillo Hospital District*, 5 Cir. 1981, 654 F.2d 1148, 1153–54 & n.8; *see also Wetzel v. Liberty Mutual Insurance Co.*, 3 Cir. 1975, 508 F.2d 239, 245 n.6, *cert. denied*, 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679. The cases cited by the district judge suggest that he denied certification because of his concern that the interests of the named plaintiffs may be antagonistic to those of some members of the proposed class.[44] *East Texas Motor Freight v. Rodriguez*, 1977, 431 U.S. 395, 97 S.Ct. 1891, 52 L.Ed.2d 453; *Aiken v. Nieman-Marcus*, N.D.Tex.1977, 77 F.R.D. 704. As the defendant argues, many students and parents may support the program as a potentially effective means of combating a serious problem of drug and alcohol abuse.

The district court identified correctly the cause for concern here as the adequacy of the named plaintiff, for it is clear that the case satisfies the other prerequisites to a class action.[45] First, the class includes 15,400 members—all students enrolled in GCISD who are subject to the canine sniff searches. Even though the class members reside in a relatively small geographic area, the enormity of the number renders joinder impracticable. Fed.R. Civ.P. 23(a)(1). Second, there are common questions of law and fact, including how the school district conducted the sniffing procedures and the subsequent body searches, whether the sniffing constitutes a search, and, if so, whether that search is unreasonable. Rule 23(a)(2). Third, the claims of

the named plaintiffs are typical of those of the class, for all three of the named plaintiffs have been subjected to sniffing, and two of the named plaintiffs have been subjected to further searches. Rule 23(a)(3). *See* note 54. Fourth, the party opposing the class has acted on grounds generally applicable to the class, so that injunctive and declaratory relief with respect to the class as a whole are appropriate, rule 23(b)(2), leaving only the adequacy of the named plaintiffs in question, rule 23(a)(4).

The adequacy requirement mandates an inquiry into the zeal and competence of the representative's counsel and into the willingness and ability of the representative to take an active role in and control the litigation and to protect the interests of absentees, *see, e.g., Jaurigui v. Arizona Board of Regents*, D.Ariz.1979, 82 F.R.D. 64; *Klein v. Miller*, N.D.Tex.1978, 82 F.R.D. 6, 8. Some aspects of this requirement are clearly satisfied. The zeal and competence of the named plaintiffs' counsel, an attorney practicing with a major Houston law firm and staff counsel of the American Civil Liberties Union, even had they been open to question at the outset, can no longer be challenged after their performance in prosecuting this appeal. Also, we see no reason to doubt the ability and willingness of the named plaintiffs and their next friend to participate in and control the litigation. Although the defendant contends that, at his deposition, the plaintiffs' next friend had not read the complaint and was unaware that he was representing others, examination of the transcript of his deposition shows that Horton stated only that he had not read the particular copy of the complaint presented, and he categorically stated that he was aware that he was representing a class. On the whole, Horton's deposition shows commendable familiarity with the complaint and with the concept of a class action. In that

---

**44.** The judge may have thought that the plaintiffs simply failed to meet their burden of proof. As our discussion will show, we disagree.

**45.** Technically, only the requirements of section (a) of rule 23 are "prerequisites" to a class

action, and section (b) describes the categories of actions maintainable as class actions. The discussion here will treat qualification for a rule 23(b) category as a prerequisite to a class action.

sense, the plaintiffs have established their adequacy to protect the interests of the class.[46]

But the possibility of antagonism [47] within the class remains. Although the defendant has offered no proof of disagreement except the assertion that other parents and students have not complained about the practice, we see the chance that some class members support the canine search program as a very real possibility, and apparently the district judge agreed. In many similar cases, district judges have certified classes without discussing the problems raised by the possibility of antagonistic interests. *See, e.g., Lansdale v. Tyler Junior College*, E.D.Tex.1979, 318 F.Supp. 529, *aff'd on other grounds*, 5 Cir. 1972, 470 F.2d 659 (en banc), *cert. denied*, 1973, 411 U.S. 986, 93 S.Ct. 2268, 36 L.Ed.2d 964; *Nolop v. Volpe*, 1971 D.S.D., 333 F.Supp. 1364; *Sullivan v. Houston Independent School District*, S.D.Tex.1969, 307 F.Supp. 1328, *vacated on merits*, 5 Cir. 1973, 475 F.2d 1071, *cert. denied*, 414 U.S. 1032, 94 S.Ct. 461, 38 L.Ed.2d 323; *see also Foster v. Sparks*, 5 Cir. 1975, 506 F.2d 805. In other cases, courts have been content simply to observe that unanimity can never be achieved in large classes and have proceeded on that basis to certify a class. *See Rosado v. Wyman*, E.D.N.Y.1970, 322 F.Supp. 1173, 1193–94, *aff'd*, 2 Cir., 437 F.2d 619, *aff'd mem.*, 1971, 402 U.S. 991, 91 S.Ct. 2169, 29 L.Ed.2d 157. Yet there is good

authority for denying class certification on the basis of significant disagreement within the class. *See, e.g., East Texas Motor Freight System, Inc. v. Rodriguez*, 1977, 431 U.S. 395, 405, 97 S.Ct. 1891, 1897, 52 L.Ed.2d 453, 463 (alternative holding); *Peterson v. Oklahoma City Housing Authority*, 10 Cir. 1976, 545 F.2d 1270, 1273; *Swain v. Brinegar*, 7 Cir. 1975, 517 F.2d 766 (alternative holding), *reheard on merits*, 7 Cir. 1976, 542 F.2d 364 (en banc); *Ihrke v. Northern States Power Co.*, 8 Cir. 1972, 459 F.2d 566, *vacated as moot*, 409 U.S. 815, 93 S.Ct. 66, 34 L.Ed.2d 72; *Schy v. Susquehanna Corp.*, 7 Cir. 1970, 419 F.2d 1112, *cert. denied*, 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55; *Troup v. McCart*, 5 Cir. 1957, 238 F.2d 289 (alternative holding); *Giordano v. Radio Corporation of America*, 3 Cir. 1950, 183 F.2d 558. It is true that in several of these cases, there was hard evidence of real disagreement. In *Peterson*, for instance, many of the tenants in a low-rent housing project had executed leases containing the security deposit provision that was the subject of the suit, and the defendant presented evidence that many of them thought that the security deposit would benefit members of the proposed class because it would lead to better care for neighboring units. Similarly, in *East Texas Motor Freight*, the members of the local union that included the class had voted against the relief sought by the plaintiffs. But in some cases, a realistic possibility of antagonism, without more, has

---

**46.** We reject the suggestion in the defendant's brief that a putative representative must present proof of financial resources in order to meet his burden of proof on the issue of adequacy. The case relied upon by the defendant holds only that the class opponent may undertake discovery of the putative representative's financial condition. *See Klein v. Miller*, N.D. Tex.1978, 82 F.R.D. 6. In the absence of any reason to believe that the named plaintiffs have inadequate resources and particularly in the light of their proven ability to litigate and pursue an appeal, we think that the plaintiffs have met their burden on this issue. *See generally* Comment, *Class Certification: Relevance of Plaintiff's Finances and Fee Arrangements with Counsel*, 40 U.Pitt.L.Rev. 70, 82 (1978).

**47.** Intraclass antagonism may be analyzed under either rule 23(a)(4), the adequacy require-

ment, or rule 23(a)(3), the typicality requirement. *See* 7 C. Wright & A. Miller, Federal Practice and Procedure §§ 1768, 1769 (1972). The requirements are closely related, for demanding typicality on the part of the representative helps ensure his adequacy as a representative. We prefer to analyze the question of intraclass antagonism under the requirement that the representative protect adequately the interests of the class rather than under the requirement that his claims be typical, because each class member *has* the claim asserted by the plaintiffs, so the plaintiffs' claims are typical, but many members do not see it as in their best interests to assert that claim. The real question then is whether, in spite of the typicality of their claims, the named plaintiffs can adequately represent the interests of the class, including any interest in not asserting claims.

resulted in a denial of certification. *See, e.g., Swain v. Brinegar*, 7 Cir. 1975, 517 F.2d 766 (alternative holding), *reheard on merits*, 7 Cir. 1976, 542 F.2d 364 (en banc); *Ihrke v. Northern States Power Co.*, 8 Cir. 1972, 459 F.2d 566, *vacated as moot*, 409 U.S. 815, 93 S.Ct. 66, 34 L.Ed.2d 72. And since the burden of proof on certification issues is on the plaintiff,[48] we think it improper to demand much evidence from the defendant that a significant number of class members oppose the plaintiff when it is obvious that a real possibility of antagonism exists.

We perceive unresolved tension between the cases permitting certification in these circumstances and the leading case on adequacy of representation for purposes of binding class members, *Hansberry v. Lee*, 1940, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22. In *Hansberry*, a number of landowners signed a covenant not to sell or lease to blacks. The covenant took effect only when signed by 95% of the landowners. One landowner brought a class action, on behalf of all the others, to enforce the covenant against parties who had acquired or asserted an interest in property formerly owned by one who had signed the covenant. The court granted enforcement on the basis of a fraudulent and collusive stipulation that 95% of the landowners had signed the covenant. In a second action brought by another landowner relying on the res judicata effect of the earlier action, the Illinois courts held the defendant bound by the earlier judgment as a member of the class. The Supreme Court reversed, holding that due process precluded binding a party to a judgment when neither had he had notice and an opportunity to be heard nor had he been adequately represented. In *Hansberry*, the representation in the first action had been inadequate. As the Court stated,

It is one thing to say that some members of a class may represent other members in a litigation where the sole and common interest of the class in the litigation is either to assert a common right or challenge an asserted obligation. It is quite another to hold that all those who are free alternatively either to assert rights or to challenge them are of a single class so that any group merely because it is of the class so constituted, may be deemed adequately to represent any others of the class in litigating their interests in either alternative. Such a selection of representatives ... does not afford that protection to absent parties which due process requires.

311 U.S. at 44–45, 61 S.Ct. at 119, 85 L.Ed. at 28–29 (citations omitted).

*Hansberry*, however, cannot be read to forbid class actions[49] in every case in which class members disagree. On the contrary,

... [i]n any conceivable case, some of the members of the class will wish to assert their rights while others will not wish to do so. Thus the familiar case of the stockholders' derivative suit is almost invariably brought by minority stockholders to challenge action that a majority of the stockholders approve. Yet it is routinely regarded as an appropriate class suit. Another familiar class suit is that in which one or more taxpayers of a community, suing on behalf of all, challenge the validity of a proposed public expenditure. It is difficult to believe that there has ever been such a case in which a good many of the taxpayers would not have preferred that their rights not be enforced, because of their interest in having the expenditure made. Yet no one has ever doubted the propriety of bringing such a suit as a class action.

---

**48.** *See, e.g., Aiken v. Nieman-Marcus*, N.D.Tex. 1977, 77 F.R.D. 704, 704; *see generally* 7 C. Wright & A. Miller, Federal Practice and Procedure § 1759 (1972).

**49.** *Hansberry*, of course, does not directly forbid class actions; it simply held that some class actions will not bind the class. But rule 23(a) is designed to permit certification only in those

cases in which the class can be bound and in which courts in subsequent actions would hold, consonant with due process, that res judicata barred any further litigation by class members on the cause of action. *See* Fed.R.Civ.P. 23(c)(3) advisory committee note. Thus *Hansberry* indirectly prohibits class actions that will not bind the class.

Wright, *Class Actions*, 47 F.R.D. 169, 174 (1969). *Hansberry* holds only that class members cannot be bound *solely* on the basis of the representative's membership in the class if some members disagree, and, along with rule 23(a), *Hansberry* directs courts to adopt procedures to protect the interests of absentees before purporting to bind them. Thus, the district court here was properly concerned, for *Hansberry* mandates concern for adequate protection of absent class members. But the concern need not preclude certification. The very existence of the class procedure suggests a policy in favor of making it available to litigants when possible. And the important functions served by class litigation—facilitating the assertion of claims and defenses and protecting the judicial system from repetitive litigation—also militate in favor of devoting some ingenuity to making the class device available. Rule 23 provides a district judge with great flexibility to adopt any appropriate procedures, issue appropriate orders, and invite intervention. *See generally Eisen v. Carlisle & Jacquelin*, 2 Cir. 1968, 391 F.2d 555, 563. It explicitly permits him to certify conditionally or to de-certify a class if it becomes apparent that the representation is inadequate,[50] indicating that judges should err in favor of certification. *See generally* 7A C. Wright & A. Miller, Federal Practice and Procedure § 1785 (1972).

In this case, a variety of techniques was available to the district judge. For instance, he could have ordered notice of the action and of the relief requested by the plaintiff to the other students and parents to be posted or distributed to the students at the schools, an effective and relatively inexpensive way to apprise other members of the litigation and to invite intervention to challenge the representation or to oppose the named plaintiffs.[51] Those who chose not to intervene would have received the notice and opportunity to be heard that fulfills the requirements of *Hansberry*. In addition, the trial judge could have certified the class conditionally, before considering the merits of the summary judgment motions, to provide time for disagreement among class members to come to his attention.

We think it unnecessary to undertake these procedures in this particular case, although their use might increase the protection of the absentees, for we think that the parties in this case protected the interests of all absentees, as required by *Hansberry*.[52] Though some members may disagree with the named plaintiffs, their position has been asserted energetically and forcefully by the defendant, which has argued that the school administration must be able to use these searches to combat a serious drug problem. *Accord, Dierks v. Thompson*, 1 Cir. 1969, 414 F.2d 453, 457; *Sturdevant v. Deer*, E.D.Wis. 1976, 73 F.R.D. 375; *Rota v. Brotherhood of Railway, Airline & Steamship Clerks*, N.D. Ill.1974, 64 F.R.D. 699; *see generally Developments in the Law—Class Actions*, 89 Harv.L.Rev. 1318, 1476, 1481 (1976). In many cases, we would hesitate to rely on the opponent of the class to represent the views of dissenting class members. *Hansberry* itself illustrates all too clearly the dangers of collusion in such a case, for the

---

**50.** Fed.R.Civ.P. 23(c)(1).

**51.** *Cf. Snyder v. Bd. of Trustees of Univ. of Illinois*, N.D.Ill.1968, 286 F.Supp. 927, 931 (inviting dissenting class members to intervene to request modification of the judgment or exclusion from the class).

**52.** A second consideration supporting our decision is that the absentee members will not be much better protected from the effect of the decision if we deny certification. In a case like this one, the stare decisis effect of our decision that the sniffing procedures are unconstitutional will, as a practical matter, put an end to all searches. *See Ihrke v. Northern States Power*

Co., 8 Cir. 1972, 459 F.2d 566, 572, *vacated as moot*, 409 U.S. 815, 93 S.Ct. 66, 34 L.Ed.2d 72; *Snyder v. Bd. of Trustees of Univ. of Illinois*, N.D.Ill.1968, 286 F.Supp. 927, 931; *Rosado v. Wyman*, E.D.N.Y.1970, 322 F.Supp. 1173, 1194, *aff'd*, 2 Cir., 437 F.2d 619, *aff'd mem.*, 1971, 402 U.S. 991, 29 L.Ed.2d 157, 91 S.Ct. 2169, 29 L.Ed.2d 157; 7 C. Wright & A. Miller, Federal Practice and Procedure § 1771 (1972); *see also Bailey v. Patterson*, 5 Cir. 1963, 323 F.2d 201, *cert. denied*, 1964, 376 U.S. 910, 84 S.Ct. 666, 11 L.Ed.2d 609; *see generally Developments in the Law—Class Actions*, 89 Harv.L.Rev. 1318, 1486–87 (1976).

court in the initial action there could have viewed the defendant landowner as the protector of the interests of all landowners opposing enforcement of the covenant. But in this case, the defendant vigorously opposed certification. In such circumstances, the possibility of collusion is virtually nil, and we can rely on the defendant to present to the court the arguments supporting the contention of any dissident absentees that the sniffing is not an unconstitutional search.[53] Consequently, we direct that a class of all students enrolled in GCISD be certified on the question of the constitutionality of the searches.[54]

## V.

We conclude that the use of dogs in dragnet sniff-searches of the students of GCISD is unconstitutional, and we direct the district court to grant relief by appropriate declaration and injunction. Although the use of the dogs in similar dragnet sniffing of lockers and cars is permissible, we must remand to the district court for the case to proceed to trial on the reliability of the dogs' reactions as the basis for further searches. We also direct certification of a class on the issue of the constitutionality of the practices.

REVERSED AND REMANDED.

---

53. There may also be disagreement among class members over appropriate relief. On that issue, we cannot depend on the defendant to represent the views of all absentees. As a result, we direct certification on the issue of liability only, a procedure explicitly provided by rule 23(c)(4)(A).

54. The defendant suggested in the district court but has not argued before us that the case was moot as to Robby Horton and Sandra Sanchez, who were seniors when the complaint was filed. Robby did not graduate before the district court decision, but presumably he and Sandra have both graduated, and Heather is currently a junior. Even if the certification in this case does not "relate back" to the filing of the complaint, *Sosna v. Iowa*, 1975, 419 U.S. 393, 402 n.11, 95 S.Ct. 553, 559 n.11, 42 L.Ed.2d 532, 542 n.11, a question we need not and do not decide, at the time of certification Heather is still a member of the class she seeks to represent. *Id.*, 419 U.S. at 402, 95 S.Ct. at 558, 42 L.Ed.2d at 542. Her claims are typical, for her person as well as her locker and her automobile are currently subject to sniffing and, if she or her property triggers an alert, the defendant's policy requires a further search.