[Crim. No. 8005. Fourth Dist., Div. One. Sept. 12, 1975.]

THE PEOPLE, Plaintiff and Appellant, v.
ANTHONY EDEN WILLIAMS, Defendant and Respondent.

**COUNSEL**

Edwin L. Miller, Jr., District Attorney, Terry J. Knoepp and F. Dale Marriott, Deputy District Attorneys, for Plaintiff and Appellant.

David A. Stevens, under appointment by the Court of Appeal, for Defendant and Respondent.

## Opinion

### BROWN (Gerald), P. J.—

#### Bourbon's Nose Knows, or the Case of Bourbon's Bust

The People appeal an order dismissing their action on the court's own motion (Pen. Code, § 1385) following the suppression of evidence (Pen. Code, § 1538.5).

■ As is often necessary to say for the benefit of an appellant, we recite the evidence most favorably in support of the trial court's order to suppress, and follow the well-established rule, recently reiterated in *People* v. *Superior Court* [*Keithley*], 13 Cal.3d 406, 410 [118 Cal.Rptr. 617, 530 P.2d 585]: "A proceeding under section 1538.5 to suppress evidence is a full hearing on the issues before the superior court sitting as a finder of fact. [Citations.] The power to judge credibility of witnesses, resolve conflicts in testimony, weigh evidence and draw factual inferences, is vested in the trial court. On appeal all presumptions favor proper exercise of that power, and the trial court's findings—whether express or implied—must be upheld if supported by substantial evidence. [Citations.]"

On June 6, 1974, Arlis Lee Nash was in the United States Navy, working as a member of its narcotics addiction team in marijuana detection. He was assisted by his dog Bourbon. Bourbon had been raised and tutored in marijuana detection by Chief Petty Officer Billy Smith, the trainer of the first marijuana dog in the Navy. Smith gave Bourbon to Nash. Bourbon's skill in sniffing out marijuana had achieved an accuracy of 92 percent in tests which had been conducted, beginning two years before. Although Bourbon had never graduated from or been certified by any marijuana sniffing school, he had been certified by the Commander, Navy Air Force, Pacific Fleet. Bourbon's experience included a lot of sniffing in military barracks checks where, apparently unhampered by any Fourth Amendment problems, he would ferret out as many as 10, 15 or 20 marijuana objects a day.

Nash was also an unsalaried reserve deputy sheriff. In that capacity he, along with Bourbon, met Deputy Sheriff Richard D. Perkins in front of the San Diego International Airport, about 8:50 p.m., on June 6, 1974. The deputies were in plain clothes. Without a search warrant and without notice or knowledge of the possible presence of any narcotics,

Perkins and Nash took Bourbon to the baggage staging area of American Airlines, not open to the public, in the back of the terminal, in order that Bourbon might engage in a fishing expedition, or more precisely in this instance in a sniffing expedition, of a general, routine, exploratory nature, for marijuana, cocaine and heroin. They were not looking for weapons or bombs. Bourbon's expertise did not extend to detecting weapons or bombs; it only included marijuana, cocaine and heroin.

Bourbon had a shot at it. Soon he came to an alert, chewing and scratching at a small nylon bag in an airline baggage container. Nash then sniffed at the bag, followed by Perkins. Each thought he smelled marijuana. Perkins immediately opened the bag, found marijuana inside, took the bag to the ticket office, inquired which ticket agent could identify its owner and went with that person to a boarding gate where the agent called "Mr. Williams" and Williams responded "Yes." Perkins arrested Williams, patted him down for weapons, felt something soft in his crotch which did not feel like a weapon, reached down the inside front of his pants, removed a baggie of marijuana, then handcuffed him. Williams had two other pieces of luggage. Perkins did not smell them, did not suspect they contained contraband, but he searched them anyway. Perkins testified he was following the instructions of his superiors in the San Diego County Sheriff's department to seek out and arrest suspects possessing narcotics, using dogs.

Perkins and Nash had never personally received permission from American Airlines to conduct this type of search. Perkins testified his predecessor told him he had such permission and Perkins assumed he was its beneficiary when he took over the detail.

The American Airlines' manager of airport services in San Diego testified he had never given narcotics task force officers blanket authority to make general exploratory searches of luggage in the baggage area. Because of this case, he wrote a directive letter to the company's employees that they may not give permission to law enforcement officers to enter the airline's baggage room, nor to make searches. Of course, under CAB regulations, airline employees could search baggage (see *People* v. *McKinnon,* 7 Cal.3d 899, 913-914 [103 Cal.Rptr. 897, 500 P.2d 1097]).

In a carefully drawn order suppressing the evidence, the superior court found, among other things, the baggage room of American Airlines was not open to the general public and was, in fact, a "secured area" next to

the ramp where airplanes are loaded; Deputies Perkins and Nash were not engaged in enforcing skyjacking or air piracy regulations; neither Perkins, Nash nor Bourbon was acting as an agent of the airline. The court observed: "The record in this case contains no evidence of any cause to believe there might possibly have been any contraband for Bourbon to find amongst the effects of American Airlines' passengers on the night of June 6th." The court found as a fact and concluded as a matter of law the deputies and Bourbon had no probable cause to enter the airline baggage room for the purpose of having Bourbon inspect the baggage for contraband before it was loaded on the airplane. For this purpose they were trespassers.

Substantial evidence supports the superior court's findings and order. The People's argument to the contrary is misconceived in that it is premised on the false assumption that reasonable implications should be made to support the deputies' and Bourbon's actions, when the superior court held otherwise (*People* v. *Superior Court* [*Keithley*], *supra,* 13 Cal.3d 406, 410). The superior court did not hold the deputies' and Bourbon's entry into the baggage area was a trespass for *all* purposes, but for the purpose here, they trespassed.

The People's reliance on *People* v. *McKinnon, supra,* 7 Cal.3d 899 at page 914, is not helpful in that *McKinnon* concerns freight shipped by common carrier, where the contents are declared according to tariff regulations, and the carrier may inspect.

This case is quite unlike *People* v. *Furman,* 30 Cal.App.3d 454 [106 Cal.Rptr. 366], where officers had probable cause, based upon a reliable informant's tip, to investigate Furman for possible marijuana in his baggage as he was about to leave San Diego by plane, and the dog Link immortalized himself in corroborating the informant's tip. In the present case, there was no suggestion of the possible presence of contraband in advance of Bourbon's nosing it out.

The officers' conduct was illegal, a gross departure from constitutional precepts.

On June 10, 1788, John Marshall addressed the Virginia Convention called to ratify the Constitution of the United States: "What are the favorite maxims of democracy? A strict observance of justice and public faith and a steady adherence to virtue. These, sir, are the principles of a good government. No mischief, no misfortune, ought to deter us from a

strict observance of justice and public faith." (Marshall on the Federal Constitution, in 3 The World's Famous Orations (1906) p. 144.)

The agents of the government must observe the law in enforcing it.

"If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy." (Brandeis, J. dissenting in *Olmstead* v. *United States,* 27/ U.S. 438, 485 [72 L.Ed. 944, 960, 48 S.Ct. 564, 66 A.L.R. 376].)

"It is morally incongruous for the state to flout constitutional rights and at the same time demand that its citizens observe the law." (*People* v. *Cahan,* 44 Cal.2d 434, 446 [282 P.2d 905].)

"Nothing can destroy a government more quickly than its failure to observe its own laws, or worse, its disregard of the charter of its own existence." (*Mapp* v. *Ohio,* 367 U.S. 643, 659 [6 L.Ed.2d 1081, 1092, 81 S.Ct. 1684, 84 A.L.R.2d 933].) ·

Order affirmed.

Ault, J., and Cologne, J., concurred.