[Crim. No. 2538. Fifth Dist. Jan. 14, 1977.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT DONALD EVANS, Defendant and Appellant.

**COUNSEL**

Jackson S. Wallace, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Marjory Winston Parker and John R. Duree, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**BROWN (G. A.), P. J.**—Pursuant to a plea bargain appellant, Robert Donald Evans, pleaded guilty to possession of marijuana for sale (Health & Saf. Code, § 11359). He appeals from the judgment, raising search and seizure issues pursuant to Penal Code section 1538.5, subdivision (m).

Determinative of the cause is our conclusion that the police officers did not have sufficient justification to stop and detain appellant and his codefendant, who was driving a pickup in which appellant was a passenger, and in the bed of which pickup there were approximately 25 pounds of marijuana. The plea and judgment herein were based solely upon that evidence.

It was stipulated that the evidence taken at the preliminary hearing, together with the evidence presented at the hearing on the Penal Code section 1538.5 motion to suppress and Penal Code section 995 motion to dismiss could be considered by the court in ruling on the motions.

Resolving conflicts in favor of the respondent, it appears that at about 2:30 p.m. on June 2, 1975, Detectives Fernandez and Grogan of the Modesto Police Department undertook surveillance of mini-warehouse compartments Nos. 20 and 21, near Ceres, California. They were watching the warehouses with binoculars from a concealed position on a neighbor's property with consent of the neighbor. The mini-warehouse complex contained 40 numbered compartments which were individually rented to members of the public for the purpose of storage. They did not know who was the renter or renters of compartments 20 and 21.

Upon arrival to take up their surveillance, Fernandez and Grogan met an agent of the drug enforcement unit and two agents of the United States Customs Service with two of their dogs purportedly trained to detect the location of marijuana by its odor. These agents did not testify at the preliminary hearing or at the combined hearing of the Penal Code sections 1538.5 and 995 motions. At the time the detectives arrived two customs agents were in the process of causing the dogs to sniff at various compartments of the warehouse complex. The record is entirely silent on the background of the agents' investigation, the extent of their preknowledge, if any, regarding the location of marijuana in compartment 20 or 21 or in any of the compartments, or their knowledge, if any, regarding the renter or renters of these two compartments. It does appear, however, that the dogs sniffed all of the mini-warehouses, finally stopping at warehouses 20 and 21, and upon reaching that location they reacted by growling, barking, biting at the locks and scratching at the doors. The detectives were advised by the customs and drug enforcement unit agents that the dogs' reactions meant marijuana was present. The dogs did not react at any of the other warehouses.

The record does not contain a description of the physical layout of the mini-warehouses nor does it appear whether the location from which the dog handlers and the dogs operated was a public or private street or an area or location at which they had a right to be.

It also appears that Detective Fernandez had seen the dogs with their handlers approximately 12 hours before at some other warehouse area. At that time Fernandez had seen a demonstration of the dogs' capabilities in detecting marijuana through their sense of smell. Five marijuana bricks were secreted in five different locations from 50 to 100 feet away from the dogs. Each dog was released separately to attempt to locate the marijuana cache. Both dogs found all five bricks. Detective

Fernandez also stated that he had seen the dogs in action that same day at another mini-warehouse location near Turlock.

The two detectives continued their surveillance of compartments 20 and 21 until approximately 6:50 p.m. At about that time a Chevrolet pickup pulled up and stopped at the side of the compartments. Two men got out of the truck and one walked toward the northeast corner of the building and the other to the southeast corner of the building and looked around. They met each other back at the pickup truck, and then appellant went to the door of space No. 20, appeared to unlock the door, lifted the sliding door, and went into the warehouse. His companion, Elgen, remained outside by the pickup. A few moments later appellant emerged from the warehouse and motioned Elgen to bring the truck around to the door of space No. 21, which Elgen subsequently did. Appellant returned to the inside of the warehouse and brought out a large plastic bundle and placed it in the bed of the pickup. He lifted what looked like a tire and placed it on the bundle or next to it. Appellant secured the door of the warehouse, got back in the vehicle, and they drove away with Elgen driving. At that point Fernandez, who was using the binoculars, stated "They got something out of the warehouse. Let's follow them." Both officers testified they did not observe anything in particular about the plain plastic bundle which was carried from the warehouse and placed in the bed of the pickup. Specifically, neither officer testified that the size, shape or appearance of the clear plastic bundle caused him to believe that the package contained marijuana. The detectives followed the truck because they were trying to obtain a search warrant for the warehouse.

The detectives were not in uniform and were driving an unmarked vehicle. As they followed the pickup at distances varying from 4 to 20 car lengths they noticed no traffic violations, no furtive conduct, and were aware of no outstanding traffic warrants for the occupants of the pickup. When Fernandez was asked why the detectives stopped appellant and Elgen, he said that it was "Because it was my impression from what I had observed, that they just picked up marijuana at the warehouse," that it was not his intention to arrest them but that "It was my intention to stop them and find out who they were."

It appears that appellant and Elgen eventually drove into a parking lot at a bar and stopped, and the officers pulled up and stopped behind

them and slightly to their left.[1] The officers then alighted from their vehicle with guns drawn and ordered appellant and Elgen out of the pickup and face down onto the pavement. At that point Grogan stated, "That's marijuana," referring to the bundle in the bed of the pickup truck. At that moment Fernandez had been searching appellant and Elgen for weapons and found none. When he heard the words of Grogan he handcuffed appellant and Elgen and called for a patrol unit. When it arrived he placed appellant and Elgen in the patrol car and advised them they were under arrest. Detective Fernandez then walked to the rear of the pickup and himself observed the package of marijuana. Subsequent search of the passenger area of the truck disclosed a scale. Detective Fernandez estimated the quantity of marijuana to be in the neighborhood of 12 kilograms (about 25 pounds).

After the pickup had been stopped and at the time Fernandez had his rifle leveled at the pickup occupants, ordering them out of the pickup, Evans turned around and Fernandez then recognized him as a person he had booked approximately nine months earlier in a case in which thirteen pounds of marijuana were seized. Other individuals were charged with criminal offenses as a result of that incident, but appellant was not

---

[1] A detailed examination of the record leaves no doubt that the detectives actually stopped the appellant and Elgen. It appears that before they arrived at the parking lot Fernandez drove alongside of the pickup and Grogan displayed his police badge to appellant and Elgen and that appellant and Elgen shortly thereafter pulled into the lot at a speed of about 5 to 10 miles per hour. Moreover, it is implicit in the detectives' testimony that they stopped appellant and Elgen. A few examples will suffice:
Detective Fernandez testified in response to questioning:
"Q. ... I mean why were you stopping them to search them at that point?
"A. Because it has been my experience that most people dealing with marijuana carry weapons with them.
"Q. ... Why did you pull them over?
"A. Because it was my impression from what I had observed, that they just picked up marijuana at the warehouse."
Detective Grogan testified:
"Q. ... Now, how far were you behind this vehicle as you followed it from the warehouse over to where you stopped them?
"A. At different times I was as close as four car lengths, as far away as 20 car lengths.
" . . . . . . . . . . . . . . . .
"Q. So the closest you were to them was right before you stopped them?
"A. Yes, sir.
" . . . . . . . . . . . . . . .
"Q. ... Are you saying all the way down Ninth Street until you stopped them, you never looked at the back of the pickup truck?
"A. No, sir. I said at the time we stopped them, I was looking at the driver and the passenger."
In addition, in the trial court the prosecution conceded that appellant was stopped, and the Attorney General makes no argument to the contrary in this court.

charged. On the prior occasion $1,700 was found on appellant, together with what appeared to be receipts for the sale of kilos of marijuana.

Turning to the applicable legal standards for a traffic stop and detention, this court in *People* v. *Podesto* (1976) 62 Cal.App.3d 708 [133 Cal.Rptr. 409] recently summarized the frequently stated rules as follows: ■ "It is well established that circumstances short of probable cause to make an arrest may warrant a temporary detention for purposes of investigating possible criminal activity. (*Terry* v. *Ohio* (1968) 392 U.S. 1, 22 [20 L.Ed.2d 889, 906-907, 88 S.Ct. 1868, 1880].) Before such a detention may be undertaken, however, there must be a rational suspicion that something out of the ordinary has taken place, that the activity is related to a crime, and that the person detained is connected to the activity. (*Irwin* v. *Superior Court* (1969) 1 Cal.3d 423, 427 [82 Cal.Rptr. 484, 462 P.2d 12].) The test in determining the validity of a temporary detention is to inquire whether the circumstances 'are such as to indicate to a reasonable man in a like position that such a course is necessary to the proper discharge of the officer's duties, . . .' (*People* v. *Robles* (1972) 28 Cal.App.3d 739, 744 [104 Cal.Rptr. 907].) The circumstances must be such as to distinguish the activity of the detained person from that of any other citizen and must be based on an objective perception of events rather than the subjective feelings of the officers. (See *Irwin* v. *Superior Court, supra,* 1 Cal.3d at p. 426; *People* v. *Moore* (1968) 69 Cal.2d 674, 683 [72 Cal.Rptr. 800, 446 P.2d 800]; *People* v. *One 1960 Cadillac Coupe* (1964) 62 Cal.2d 92, 95-96 [41 Cal.Rptr. 290, 396 P.2d 706].) Moreover, where the events are as consistent with innocent activity as with criminal activity, a detention based on those events is unlawful. (*Irwin* v. *Superior Court, supra,* 1 Cal.3d at p. 427; cf. *People* v. *Superior Court (Acosta)* (1971) 20 Cal.App.3d 1085, 1088 [98 Cal.Rptr. 161]; *People* v. *Higbee* (1974) 37 Cal.App.3d 944, 950 [112 Cal.Rptr. 690].)" (62 Cal.App.3d at pp. 716-717.) And it must be added that the detaining officers must be able to point to "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." (*Terry* v. *Ohio* (1968) 392 U.S. 1, 21 [20 L.Ed.2d 889, 906, 88 S.Ct. 1868, 1880].) A mere hunch or subjective suspicion will not justify a temporary detention. (*People* v. *Perez* (1966) 243 Cal.App.2d 528, 531 [52 Cal.Rptr. 514]; *People* v. *Hunt* (1967) 250 Cal.App.2d 311, 314-315 [58 Cal.Rptr. 385].) Unusual activity alone, unless there is some suggestion that it is related to criminality, is insufficient. (*People* v. *Henze* (1967) 253 Cal.App.2d 986, 988 [61 Cal.Rptr. 545]; *People* v. *Manis* (1969) 268 Cal.App.2d 653, 660 [74 Cal.Rptr. 423].)

██ Applying these principles to the instant case, it is manifest that if the knowledge the officers gained as a result of the sniffing activities of the dogs is permitted to be utilized, they had a reasonable basis grounded on objective articulable facts for believing that appellant and Elgen had picked up marijuana at the warehouse and were engaging in illegal activity, thus justifying the stop and detention. However, absent the information obtained as a result of the activities of the canine cannabis connoisseurs,[2] the conclusion is equally inescapable that there was not a sufficient articulable factual basis to justify the stop. The appellant and Elgen violated no traffic law and did not drive in an evasive manner or engage in furtive conduct as they drove down the street. From all that appears, appellant and Elgen picked up an inherently unsuspicious clear plastic bag from a mini-warehouse on a summer evening in broad daylight and were driving down the street when, based on nothing more than a hunch or a subjective suspicion, they were stopped by the detectives. Standing alone, looking in each direction before opening the warehouse and loading the package is not sufficient to justify the stop as this conduct was just as consistent with innocence as it was with guilt. In this era of high crime, this conduct could have been nothing more than assuring that no person with evil intentions was lurking about.

The only other articulable fact stated by the officers was that Fernandez recognized appellant as a person who was present at a prior marijuana bust. However, an examination of the record makes clear that that recognition did not occur until after the stop occurred; thus it cannot be used as justification for making the stop before that time.

██ Obviously, therefore, the legality of the conduct of the customs agents and the sniffing canines becomes critical in appraising the legality of the stop and detention because the information obtained as a result thereof furnishes the essential basis upon which the stop and detention can be justified. If the use of the dogs is held to be violative of appellant's Fourth Amendment rights, the fruits of that illegality must be suppressed. (*Wong Sun* v. *United States* (1963) 371 U.S. 471, 484 [9 L.Ed.2d 441, 453, 83 S.Ct. 407, 416]; *People* v. *Edwards* (1969) 71 Cal.2d 1096, 1105 [80 Cal.Rptr. 633, 458 P.2d 713]; *People* v. *Sesslin* (1968) 68 Cal.2d 418, 428 [67 Cal.Rptr. 409, 439 P.2d 321] (cert. den., 393 U.S. 1080 [21 L.Ed.2d 772, 89 S.Ct. 850]).)

---

[2]This literary usage is not original with the author.

■ Adverting to the use of the dogs, we initially observe that there is an absence of many facts which are essential to properly adjudicate this issue, and it is, of course, the People's burden to show that the activities of the governmental agents did not violate appellant's constitutional rights. (*People* v. *Dumas* (1973) 9 Cal.3d 871, 878 [109 Cal.Rptr. 304, 512 P.2d 1208]; *Horack* v. *Superior Court* (1970) 3 Cal.3d 720, 725 [91 Cal.Rptr. 569, 478 P.2d 1]; *People* v. *Johnson* (1968) 68 Cal.2d 629, 632 [68 Cal.Rptr. 441, 440 P.2d 921]; *Badillo* v. *Superior Court* (1956) 46 Cal.2d 269, 272 [294 P.2d 23].)

■ In this regard, as we have pointed out, the record is silent as to whether the agents and dogs made their observations from a position where they had a right to be and where they were not committing a trespass upon private property. (*Lorenzana* v. *Superior Court* (1973) 9 Cal.3d 626, 634 [108 Cal.Rptr. 585, 511 P.2d 33]; *Jacobs* v. *Superior Court* (1973) 36 Cal.App.3d 489, 496-497 [111 Cal.Rptr. 449]; *People* v. *Sneed* (1973) 32 Cal.App.3d 535, 542 [108 Cal.Rptr. 146].)

Secondly, and while we do not decide the issue on this ground, there is no testimony from the customs agents or others personally familiar with the past performance of the dogs as to their training and expertise nor of the expertise of the dogs' handlers. We have grave doubt that the observation of Detective Fernandez, who was otherwise unfamiliar with marijuana-sniffing canines, of the experiment with these dogs was sufficient to establish their qualifications and capabilities.

Finally, the record is totally devoid of facts relative to whether the customs agents, the narcotics agent or the detectives had any information prior to going to the mini-warehouse area that marijuana could be found in compartments 20 and 21. It does affirmatively appear that the dogs were used to sniff around all of the compartments and that their use so far as the record is concerned appears to have been a seeking out and exploratory in nature. ■ A review of the cases supports the conclusion that such a search with canines conducted without some preknowledge or reasonably strong suspicion that contraband is to be found in a particular location is a constitutionally impermissible invasion of the suspects' reasonable expectations of privacy and consequently a violation of the Fourth Amendment.

In *People* v. *Furman* (1973) 30 Cal.App.3d 454, 457 [106 Cal.Rptr. 366], officers received a reliable informant's tip that there might possibly be

narcotics in Furman's possession and this tip was somewhat corroborated by the officers' independent investigation. Link, a marijuana sniffing canine, was then permitted to analyze the odors emanating from the suspect's baggage in the baggage room of an airport. When Link reacted in his telltale fashion, officers arrested the suspect as he prepared to board an airplane and opened the suitcase to find 30 marijuana kilo bricks. Consistent with our conclusion herein, the court in *Furman* stated: "Adequate foundation was laid establishing the reliability of Link as an investigative device. Evidence of Link's high level performance and great degree of accuracy in detecting marijuana odors justified reliance on Link's reactions as corroboration of the informant's tip." (*People* v. *Furman, supra,* 30 Cal.App.3d 454, 457.) Thus, in *Furman* both the reasonably strong suspicion of the presence of marijuana in the suspect's bag before Link was beckoned to perform and evidence of Link's ability to discriminate between odors were present.

In *People* v. *Williams* (1975) 51 Cal.App.3d 346 [124 Cal.Rptr. 253], one Nash was working in the United States Navy as a member of the narcotics addiction team in marijuana detection and was also a reserve deputy sheriff. Nash had been given Bourbon, a marijuana sniffing dog, by one of his colleagues in the Navy. One day Nash met Deputy Perkins of the San Diego County Sheriff's office, both in plain clothes, in front of the San Diego International Airport Terminal. Without a search warrant and without knowledge of the possible presence of any narcotics, they took Bourbon to the baggage staging area of American Airlines. The staging area was not open to the public and they had not obtained permission from American Airlines to enter that area. As the court stated, Nash and Perkins entered the baggage staging area "in order that Bourbon might engage in a fishing expedition, or more precisely in this instance in a sniffing expedition, of a general, routine, exploratory nature, for marijuana, cocaine and heroin." (51 Cal.App.3d 346, 349.) Bourbon reacted to one of the bags and the officers opened it, finding marijuana. They took the bag to the ticket office, inquired of the agent as to the owner, who turned out to be Williams. The agent paged Williams, and the officers arrested him when he came forward to answer the page. The court affirmed an order dismissing the charges against defendant on the court's own motion (Pen. Code, § 1385) following the suppression of evidence under Penal Code section 1538.5. It reasoned that "the deputies and Bourbon had no probable cause to enter the airline baggage room for the purpose of having Bourbon inspect the baggage for contraband before it was loaded on the airplane. For this purpose they were

trespassers." (*People* v. *Williams, supra,* 51 Cal.App.3d 346, 350.) The *Williams* court also distinguished *Furman*: "This case is quite unlike *People* v. *Furman,* 30 Cal.App.3d 454 [106 Cal.Rptr. 366], where officers had probable cause, based upon a reliable informant's tip, to investigate Furman for possible marijuana in his baggage as he was about to leave San Diego by plane, and the dog Link immortalized himself in corroborating the informant's tip. In the present case, there was no suggestion of the possible presence of contraband in advance of Bourbon's nosing it out." (*People* v. *Williams, supra,* 51 Cal.App.3d 346, 350.)

The federal cases also have upheld the use of marijuana sniffing dogs where their use was in response to particular information supplied by informants or the surrounding circumstances. The cases do not authorize a general, exploratory search through the use of dogs. The most recent federal case is *United States* v. *Solis* (9th Cir. 1976) 536 F.2d 880. In *Solis,* agents of the Drug Enforcement Administration received a tip from an informant of unproven reliability that they would find a white semitrailer parked at the rear of a Shell service station in Santa Ana, California, and that the floor of the trailer would contain approximately one ton of marijuana. The informant identified the semitrailer as having a paper license plate and white powder spread on the outside of its rear doors. The informant advised the agents he had assisted defendant in the unloading of large quantities of white powder-covered marijuana bricks from similar trailers. That day an agent of the Drug Enforcement Administration went to the Shell service station and there found a white semitrailer matching the description provided by the informant. The agent recognized the talcum powder on the outside of the rear doors of the trailer as a common subterfuge used by marijuana traffickers to cover the telltale aroma of the contraband. The agents informed United States Customs, which dispatched two marijuana sniffing dogs to the location. The dogs, Blue and Baron, detected the odor of marijuana coming from the locked metal trailer as far away as 25 yards and confirmed the reaction within one foot of the trailer. On the basis of this information the agents obtained a search warrant, searched the trailer, and found a large quantity of marijuana. The court rejected a hard and fast rule concerning the use of marijuana sniffing dogs. The court stated the basis for its decision as follows:

"The agents had a founded suspicion based on the partial corrobora-tion of the informant's statements by confirming the location of the

trailer, the license described and the presence of the talc, known to be associated with the masking of marijuana odor. Calling upon the dogs for further corroboration by detection of the odor outside the trailer as a basis for application to a magistrate for a warrant to enter the vehicle was a reasonable course of action on the part of the agents.

"The dogs' intrusion such as it was onto the air space open to the public in the vicinity of the trailer appears to us reasonably tolerable in our society. There was no invasion of the 'curtilage'—the trailer. No sophisticated mechanical or electronic devices were used. The investigation was not indiscriminate, but solely directed to the particular contraband. There was an expectation that the odor would emanate from the trailer. Efforts made to mask it were visible. The method used by the officers was inoffensive. There was no embarrassment to or search of the person. The target was a physical fact indicative of possible crime, not protected communications. We hold that the use of the dogs was not unreasonable under the circumstances and therefore was not a prohibited search under the fourth amendment." (*United States* v. *Solis, supra,* 536 F.2d 880, 882-883.) (See also *United States* v. *Bronstein* (2d Cir. 1975) 521 F.2d 459 (cert. den.); *United States* v. *Fulero* (D.C. Cir. 1974) 498 F.2d 748 [162 App.D.C. 206]; cf. *United States* v. *Race* (1st Cir. 1976) 529 F.2d 12.)

 In the case at bench the People have utterly failed to show that the agent of the drug enforcement unit, the customs agents or the detectives had any knowledge or information regarding the location of marijuana in compartment 20 or 21 before they appeared on the scene with the dogs and conducted what appears to have been a general, exploratory search of the mini-warehouse complex.

Accordingly, on the whole record, we conclude that the prosecution has failed to meet its burden of showing that the use of the sniffing dogs was not a violation of appellant's Fourth Amendment rights against unreasonable search and seizure; that the stop and detention and discovery of the marijuana in the bed of the pickup was the direct fruit of the knowledge gained by reason of that illegality; and that absent that knowledge the officers lacked sufficient grounds to stop and detain

appellant. Consequently, the court erred in not suppressing evidence of the 25 pounds of marijuana found in the bed of the pickup truck.

The judgment is reversed with directions to dismiss the action.

Franson, J., and Loring, J.,* concurred.

*Assigned by the Chairman of the Judicial Council.