Argued and submitted September 22, 1986, resubmitted In Banc March 12, affirmed October 14, reconsideration denied December 4, petition for review allowed December 30, 1987 (304 Or 680)

## STATE OF OREGON,
*Respondent,*

*v.*

## MARK JOSEPH SLOWIKOWSKI,
*Appellant.*

(85-3779-C-2; CA A39836)

743 P2d 1126

Carl Caplan, Medford, argued the cause and filed the brief for appellant.

Stephen F. Peifer, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Dave Frohnmayer, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

VAN HOOMISSEN, J.

Buttler, J., specially concurring.

Young, J., dissenting.

## VAN HOOMISSEN, J.

Defendant appeals his convictions on two counts of possession of a controlled substance. ORS 475.992(4). He contends that the trial court erred in denying his motion to suppress evidence because search and arrest warrants were issued based on a prior unlawful search by police using a trained dog. The dispositive issue is whether a dog-sniff is a search. On these specific facts, we conclude that a dog-sniff is not a search. Therefore, we affirm.

Deputy Fillmore and dog handler Forrester conducted a police training exercise at a mini-storage facility with "Breaker," a dog trained to detect the presence of marijuana.[1] The facility contained 221 rental units, many of which, including defendant's, were secured by personal locks. Fillmore had permission from the facility's owner to use it for training purposes. Fillmore placed marijuana wrapped in plastic in an empty unit and began the training exercise. Breaker unexpectedly "alerted" to defendant's unit. Fillmore notified Deputy Kennedy, a narcotics specialist, who accompanied Fillmore, Forrester and Breaker back to the area. Again, Breaker alerted to defendant's unit. Kennedy then got down on his hands and knees and put his nose to the outside of the unit's door. He smelled a strong odor of marijuana coming from inside.[2] The police then obtained a warrant to search the

---

[1] Deputy Kennedy's affidavit states, in relevant part:

"That on October 24, 1985, affiant spoke to Deputy Dan Fillmore of the Jackson County Sheriff's Department. That Deputy Fillmore told affiant that he was assisting Jean Forster and a canine she owns by the name of "Breaker." That said canine has been trained to detect the presence of marijuana, a controlled substance. That said training consist of 40 hours of marijuana detection through a Washington State Police Canine Drug Seminar and 30 hours of marijuana detection instructed by the United States Customs Division sponsored by the Washington State Police Canine Association.

"That during said training, canine Breaker was 100 percent accurate in locating the concealed controlled substance and has been documented by the Washington State Police Canine Association.

"That on 10-24-85, affiant also spoke to Jean Forster and was also told that she has conducted approximately an additional 90 hours of training from instructions she received during both seminar trainings in the State of Washington. That Jean Forster told affiant, said canine was accurate in locating the concealed marijuana, a controlled substance."

[2] In *Johnson v. United States,* 333 US 10, 13, 68 S Ct 367, 92 L Ed 436 (1948), the Supreme Court stated:

"If the presence of odors is testified to before a magistrate and he finds the affiant

unit and seized almost 20 pounds of marijuana. Later, defendant was arrested and found in possession of hashish. The trial court denied his motion to suppress.

Defendant contends that the trial court erred in denying his motion. He argues that allowing Breaker to sniff his storage unit was a search, not justified by a reasonable suspicion that the unit contained contraband, that violated the state and federal prohibitions against unreasonable warrantless searches. He argues further that the fruit of the poisonous tree doctrine requires suppression of any evidence seized later. *See* ORS 133.683. He relies on Article I, section 9, of the Oregon Constitution, and on the Fourth Amendment. His argument is grounded on the reasonable expectation of privacy analysis enunciated in *Katz v. United States,* 389 US 347, 361, 88 S Ct 507, 19 L Ed 2d 576 (1967) (Harlan, J., concurring).[3]

The state argues that a dog-sniff is not a search and that no privacy interest was invaded, because defendant could not have any reasonable expectation of privacy in the strong odor of marijuana escaping from his unit which "announced" its contents. *See State v. Owens,* 302 Or 196, 206, 729 P2d 524 (1986). Alternatively, it argues that, if a dog-sniff is a search, then this search is "reasonable" under the plain smell variant of the plain view doctrine.[4] This is a case of first impression in

---

qualified to know the odor, and it is one sufficiently distinctive to identify a forbidden substance, this Court has never held such a basis insufficient to justify issuance of a search warrant. Indeed it might very well be found to be evidence of most persuasive character."

*See State v. Wallace,* 29 Or App 429, 432, 563 P2d 1237 (1977); *State v. Cross,* 23 Or App 536, 538, 543 P2d 48 (1975).

[3] *See State v. Carter/Burton,* 54 Or App 852, 636 P2d 460 (1981); *State v. Walle,* 52 Or App 963, 630 P2d 377 (1981). Although the issue may be in doubt, it does not appear that the Supreme Court or this court has yet adopted the *Katz* analysis under Article I, section 9. However, no Oregon appellate case has rejected that analysis. *See State v. Rounds,* 73 Or App 148, 152, 698 P2d 71, *rev den* 299 Or 663 (1985); *State v. Ohling,* 70 Or App 249, 252 n 4, 688 P2d 1384, *rev den* 298 Or 334 (1984); *but see State v. Dixson/Digby,* 87 Or App 1, 740 P2d 1224 (1987).

[4] The plain view doctrine is concerned with *seizures.* It assumes that the officer is already lawfully in a constitutionally protected place. Under the doctrine, immediately apparent seizable items which inadvertently come into the view of an officer lawfully searching in connection with another crime or for another purpose, or who otherwise has a right to be where the officer is, may be retained and used in prosecution of the crime to which they relate if the officer is already in the constitutionally protected area. *See Coolidge v. New Hampshire,* 403 US 443, 466, 91 S Ct 2022, 29 L Ed 2d 564

Oregon. *But see State v. Kosta,* 75 Or App 713, 719, 708 P2d 365 (1985), *rev allowed* 300 Or 545 (1986).[5] We first consider the question under Article I, section 9. *State v. Kennedy,* 295 Or 260, 262, 666 P2d 1316 (1983).

■ Most of the courts that have considered the issue have held that a dog-sniff is not a search *per se*.[6] In *United States v. Place, supra* n 6, 462 US at 706, the United States Supreme Court stated:

"The Fourth Amendment 'protects people from unreasonable government intrusions into their legitimate expectations of privacy.' *United States v Chadwick,* 433 US [1,] 7. We have affirmed that a person possesses a privacy interest in the contents of personal luggage that is protected by the Fourth Amendment. *Id.,* at 13. A 'canine sniff' by a well-trained narcotics detection dog, however, does not require opening the luggage. It does not expose noncontraband items that otherwise would remain hidden from public view, as does, for example, an officer's rummaging through the contents of the luggage. Thus, the manner in which information is obtained

---

(1971); *State v. Bridewell,* 87 Or App 316, 325, 742 P2d 648 (1987); *State v. Illingworth,* 60 Or App 150, 652 P2d 834 (1982), *rev den* 294 Or 569 (1983). The requirement that the discovery be "inadvertent" has been questioned by many commentators and abandoned by several jurisdictions. *See Arizona v. Hicks,* 480 US ____, ____, 107 S Ct 1149, 94 L Ed 2d 347, 357 (1987) (White, J., concurring).

[5] In *State v. Kosta, supra,* 75 Or App at 718-19, we held that the police, who had a reasonable suspicion that a package contained contraband, could temporarily detain it to make a reasonable inquiry. We also held that the police could expose the package to the olfactory senses of a dog trained in detecting contraband and that such exposure did not violate Article I, section 9, of the Oregon Constitution. The case at bar is distinguishable from *Kosta* in that, here, the state does *not* claim that the police had a reasonable suspicion that contraband would be found in the training area.

[6] *See United States v. Place,* 462 US 696, 707, 103 S Ct 2637, 77 L Ed 2d 110 (1983); *United States v. Lewis,* 708 F2d 1078 (6th Cir 1983); *United States v. Waltzer,* 682 F2d 370 (2d Cir 1982), *cert den,* 463 US 1210 (1983); *United States v. Viera,* 644 F2d 509 (5th Cir) cert den 454 US 867 (1981); *United States v. Goldstein,* 635 F2d 356 (5th Cir), *cert den* 452 US 962 (1981); *United States v. Klein,* 626 F2d 22 (7th Cir 1980); *United States v. Sullivan,* 625 F2d 9 (4th Cir 1980), *cert den* 450 US 923 (1981); *United States v. Venema,* 563 F2d 1003 (10th Cir 1977); *United States v. Solis,* 536 F2d 880 (9th Cir 1976); *United States v. Race,* 529 F2d 12 (1st Cir 1976); *United States v. Bronstein,* 521 F2d 459 (2d Cir 1975), *cert den* 424 US 918 (1976); *United States v. Fulero,* 498 F2d 748 (DC Cir 1974); *State v. Morrow,* 128 Ariz 309, 625 P2d 898 (1981); *State v. Martinez,* 113 Ariz 345, 554 P2d 1272 (1976), *adopting* 26 Ariz App 210, 547 P2d 62 (1976); *People v. Mayberry,* 31 Cal 3d 335, 182 Cal Rptr 617, 644 P2d 810 (1982); *State v. Mosier,* 392 So 2d 602 (Fla App 1981); *State v. Snitkin,* 67 Hawaii 168, 681 P2d 980 (1984); *People v. Campbell,* 67 Ill 2d 308, 367 NE2d 949 (1977), *cert den* 435 US 942 (1978); *People v. Price,* 54 NY2d 557, 446 NYS2d 906, 431 NE2d 267 (1981); *State v. Wolohan,* 23 Wash App 813, 598 P2d 421 (1979), *rev den* 93 Wash 2d 1008 (1980).

through this investigative technique is much less intrusive than a typical search. Moreover, the sniff discloses only the presence or absence of narcotics, a contraband item. Thus, despite the fact that the sniff tells the authorities something about the contents of the luggage, the information obtained is limited. This limited disclosure also ensures that the owner of the property is not subjected to the embarrassment and inconvenience entailed in less discriminate and more intrusive investigative methods.

"In these respects, the canine sniff is *sui generis*. We are aware of no other investigative procedure that is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure. Therefore, we conclude that the particular course of investigation that the agents intended to pursue here—exposure of respondent's luggage, which was located in a public place, to a trained canine—did not constitute a 'search' within the meaning of the Fourth Amendment."

That conclusion represents the culmination of an overwhelming trend among the courts. *See Comment,* "The Constitutionality of the Canine Sniff Search; From Katz to Dogs," 68 Marq L Rev 57, 81 (1984).

Like the United States Supreme Court in *Place,* many of the lower federal and state courts based their decisions on the peculiarly nonintrusive and discriminating nature of an investigatory dog-sniff. Some analogized the use of trained narcotics dogs to the use of certain sense-enhancing instruments such as binoculars and flashlights that have not been considered searches. *See, e.g., Texas v. Brown,* 460 US 730, 103 S Ct 1535, 75 L Ed 2d 502 (1983) (use of flashlight or field glasses not a search); *State v. Berg,* 60 Or App 142, 652 P2d 1272 (1982) (flashlight examination not a search); *State v. Harp,* 48 Or App 185, 616 P2d 564, *rev den* 290 Or 171 (1980), *overruled on other grounds by State v. Anspach,* 68 Or App 164, 682 P2d 786, *rev'd* 298 Or 375, 692 P2d 602 (1984) (use of binoculars not illegal search).

Other courts have sustained the admissibility of dog-sniff evidence relying on a plain smell variant of the plain view doctrine. Those courts theorize that there can be no reasonable expectation of privacy in the open air and, consequently, no constitutionally protectable interest in odors escaping from a closed container, because the dog sniffs only the air

outside the protected property and the defendant has no expectation of privacy in that air. *See, e.g., United States v. Goldstein, supra* n 6; *United State v. Sullivan, supra* n 6; *United States v. Venema, supra* n 6; *United States v. Bronstein, supra* n 6; *Doe v. Renfrow,* 475 F Supp 1012 (ND Ind 1979), *aff'd in part, remanded on other grounds* 631 F2d 91 (7th Cir 1980), *cert den* 451 US 1022 (1981); *State v. Morrow, supra* n 6; *People v. Mayberry, supra* n 6; *State v. Groves,* 65 Hawaii 104, 649 P2d 366 (1982); *People v. Wolohan, supra* n 6. ·

A minority of courts have characterized a dog-sniff as a search. *See, e.g., United States v. Beale,* 674 F2d 1327 (9th Cir 1982), *vacated and remanded,* 463 US 1202, 103 S Ct 3529, 77 L Ed 2d 1382 (1983), *on rehearing,* 736 F2d 1289 (9th Cir), *cert denied,* 469 US 1072 (1984);[7] *People v. Evans,* 65 Cal App 3d 924, 134 Cal Rptr 436 (1977); *People v. Unruh,* 713 P2d 370 (Colo), *cert den* ___ US ___ (106 S Ct 2894) (1986).

In *People v. Mayberry, supra,* a case that presents a much stronger factual context for the defendant than this case, the California Supreme Court explained:

"In our view, the escaping smell of contraband from luggage may be likened to the emanation of a fluid leaking from a container. The odor is detectable by the nose, as the leak is visible to the eye. We discern no constitutionally significant difference in the manner of escape, and conclude that any privacy right is lost when either escapes into the surrounding area." 31 Cal 3d at 342.

A dog-sniff causes no physical intrusion. It reveals something only by means of an external manifestation. The dog merely perceives an odor in the public domain and relays its perception through an "alert" to its trainer. The dissent recognizes that law enforcement used trained bloodhounds in 1859. Unlike mechanical aids such as x-rays, magnetometers and infrared photography, the dog only reveals contraband by means of the dog's entirely external examination. No "technological enhancement" is involved. The California Supreme Court noted this important distinction in *Mayberry.* Rejecting

---

[7] Defendant argues that a proper analysis recognizes that a dog-sniff is a search if it is conducted without an "articulable suspicion," citing *United States v. Beale, supra.* However, the "articulable suspicion" referred to in *Beale* is required only to make an initial *seizure* of property, in order to allow a subsequent dog-sniff. The dog-sniff here occurred without a seizure.

a contrary holding in the *original* opinion in *United States v. Beale, supra,* on which defendant relies, the California Supreme Court stated:

> "[W]ith due respect, we disagree with [*Beale's*] conclusion. *Beale* stressed the sanctity of private luggage, and opined that 'One who reposes his personal effects, *including contraband,* in a locked suitcase is surely entitled to assume that a trained canine will not broadcast its incriminating contents to the authorities.' * * * To the contrary, one who secretes illegal narcotics in his suitcase has no *protectable* privacy interest in those narcotics, nor any legitimate objection to an unintrusive method of detection which reacts *only* to such contraband. As *Beale* itself acknowledges, detection of narcotics by trained sniffer dogs is a 'minimal invasion of privacy,' involving 'no risk that an innocent person's privacy will be intruded upon.'" 31 Cal 3d at 340. (Emphasis in original.)

*People v. Evans, supra,* cited by defendant, is factually distinguishable. In *Evans,* the police were conducting a criminal investigation of the defendant, and the dog-sniff was made only after police had unlawfully stopped the defendant's car. Further, the record was silent as to whether the police and their dog had made their observations from a place where they had a right to be and where they were not committing a trespass on private property. Finally, there was no evidence as to the dog's training and experience. None of the deficiencies found in *Evans* are found in this case.

*People v. Unruh, supra,* cited by defendant, also is factually distinguishable. A locked safe was stolen by burglars from the basement of the defendant's home. After they had recovered the safe, the police refused to return it to the defendant, because they needed it as evidence in the burglary case. The police suspected that the safe contained contraband, and they permitted a narcotics dog to sniff it. The Colorado Supreme Court held that the dog sniff was a search but that the police had a "reasonable suspicion" that the safe contained contraband and, therefore, a warrantless dog sniff was permissible. In this case, the police did not take possession of defendant's unit or of its contents before Breaker alerted. Thus, no possessory or property right of defendant's was infringed. Furthermore, the escaping strong odor of marijuana "announced" the unit's contents and, therefore, no cognizable privacy right existed. *State v. Owens, supra,* 302 Or at 206.

No property or privacy right of defendant was detained, seized or invaded before a warrant was obtained. There was no trespass. Defendant himself was not inconvenienced or embarrassed in the slightest. Defendant had no protectable property or privacy interest in the strong odor of marijuana emanating from his locker. Like a chef who laces his meal with bacon, garlic and onions, defendant assumed the risk that the strong odor of marijuana would escape from his unit. On these specific facts, we hold that, because defendant had no reasonable expectation of privacy in the odor of marijuana escaping from his unit, the dog-sniff here was not a search.

The facts of this case fit squarely within the plain smell variant of the plain view doctrine.[8] The deputies had permission to use the storage facility for training purposes. Therefore, they had a right to be where they were when Breaker alerted to defendant's unit and when Kennedy smelled a strong odor of marijuana escaping from defendant's unit. Breaker unexpectedly "alerted" to defendant's unit. Therefore, the evidence inadvertently came into view. Kennedy, a narcotics investigator, put his nose to door of the unit and smelled a strong odor of marijuana coming from inside the unit. Therefore, the nature of the evidence was immediately known to the police. No technologically enhanced efforts were employed by the deputies. Those specific facts meet the requirements of the plain smell variant of the plain view doctrine. There was no search. *See State v. Bridewell, supra* n 4.

In *State v. Louis,* 296 Or 57, 61, 672 P2d 708 (1983), the Supreme Court held that photographing the defendant in his living room, notwithstanding the use of a low-powered telephoto lens, was not a search under Article I, section 9, because the police took the photographs from a place where they had a right to be, and the photographs "merely recorded what could be seen and had been seen without the camera." In this case, Breaker was used in a manner similar to the camera in *Louis.* It alerted to the strong odor of marijuana that it smelled in the air outside defendant's unit. The odor of marijuana also was detected by Kennedy thereafter.

---

[8] *See Coolidge v. New Hampshire, supra* n 4; *State v. Roles,* 75 Or App 63, 705 P2d 227 (1985); *State v. Illingworth, supra* n 4; *State v. Walle, supra* n 3; *see also* note 4, *supra.*

■     *Louis* also distinguished its facts from the use of "technologically enhanced efforts" which might allow the police to see what they ordinarily could not see, *e.g.,* a high-powered telephoto lens. It is difficult to characterize a dog as a technological enhancement. A marijuana sniffing dog does not "enhance" anything; it perceives something, *i.e.,* an odor. As the Supreme Court explained in *State v. Louis, supra:*

> "[N]ot everything that police officers see or hear one do in private quarters requires a search warrant. The question is when observation (or listening) becomes a 'search' within the legal meaning of that term. Persons may conduct themselves in otherwise protected areas in such a way that their words or acts can plainly be seen or heard outside without any special effort. One would not, for instance, expect police to obtain a search warrant to charge violation of a noise ordinance against sounds emanating from private premises. An indecent exposure in a window opening to public view is not very different. This, we think, is all that can properly be meant by the phrase that a person's conduct within private premises may be such as to sacrifice the 'expectation of privacy.' " 296 Or at 61.

The comparison to the odor of marijuana escaping from a storage unit is obvious.

For the same reasons, the trial court's ruling also is unassailable under the Fourth Amendment. *See United States v. Place, supra.*[9]

Affirmed.

**BUTTLER, J.,** specially concurring.

Because the facts of this case do not require that we decide whether the use by police of a dog trained to alert to the scent of contraband is a search under any and all circumstances, I write separately.

In this case, the officers were not out on a fishing expedition to seek out marijuana; the trial court found that they were engaged in a training exercise with "Breaker" at the

---

[9] *See also Dow Chemical Co. v. United States,* 476 US 227, 106 S Ct 1819, 90 L Ed 2d 226 (1986) (that human vision is enhanced somewhat does not raise constitutional question); *Texas v. Brown, supra* (use of flashlight or a field glass not a search); *United States v. Knotts,* 460 US 276, 103 S Ct 1081, 75 L Ed 2d 55 (1983) (use of beeper to augment sensory facilities of police not prohibited by Fourth Amendment).

mini-storage facility where they had the owner's permission. While engaged in the training exercise, "Breaker" unexpectedly alerted to defendant's storage unit, thereby indicating that it contained contraband. Under those limited and unusual circumstances, I would accept the "plain smell" doctrine, because: (1) the officers were where they had a right to be and were not engaged in a general search or fishing expedition, and the discovery of the scent was inadvertent; and (2) it was accomplished without the use of any *technological* enhancement. Because dogs with more sensitive olfactory nerves have been used in police work for centuries, I do not consider their use in this instance as a technological enhancement.

On these limited bases, I would affirm the trial court. It is not necessary to go any further in this case, and, in particular, to approve the language quoted from numerous federal cases and other jurisdictions relating to the use of trained dogs to detect contraband. Much of that language is too broad and might be used later to justify the use of electronic equipment in fishing expeditions to detect contraband. There is no reason in this case to rely on or to approve that language.

**YOUNG, J.,** dissenting.

The majority takes us on a journey to never-never land, where the police, without reasonable suspicion, randomly search for marijuana with a dog trained to search but are held by the majority not to have searched.

Defendant rented a storage locker and placed his padlock on it. The locker was his "effect" under Article I, section 9, of the Oregon Constitution.[1] *See State v. Turechek,* 74 Or App 228, 702 P2d 1131 (1985). He had a constitutionally protected property interest in the locker *and* a constitutionally protected interest in the privacy of its contents. The Supreme Court has a simple test for a search: "A 'search' occurs when a person's privacy interests are invaded." *State v.*

---

[1] It is curious that the majority, immediately after stating that it must first consider the state constitutional issues, turns solely to cases decided by the federal courts, and by other state courts under the federal constitution, alluding to a few Oregon cases only at the very end of its opinion. It then shows what can be achieved with a creative use of Westlaw, substituting numbers of cases for analysis and forgetting that our job is not to count decisions but to weigh reasoning.

*Owens,* 302 Or 196, 206, 729 P2d 524 (1986). Although there was no physical intrusion into defendant's property interest, the dog sniff did invade his privacy interests. It was, therefore, a "search."

The Supreme Court has not clearly stated how to determine what privacy interests are constitutionally protected or what police actions invade those interests. That is what we must do—and what the majority fails even to attempt—in this case. The Supreme Court has never adopted the federal "reasonable expectation of privacy" test derived from *Katz v. United States,* 389 US 347, 88 S Ct 507, 19 L Ed 2nd 576 (1967), on which the parties, and apparently the majority, place some reliance. We have criticized and refused to adopt that test for analyzing questions under the state constitution. *See State v. Dixson/Digby,* 87 Or App 1, 740 P2d 1224 (1987).[2]

The majority treats this case as a "plain smell" variant of the "plain view" doctrine, emphasizing the lack of a physical intrusion before the officers obtained the warrant. That approach ignores the nature of privacy interests. If something that is "plain" to a dog or to a machine, but not to a human, is not private, there can be few protected privacy interests. Although a transparent container may announce its contents to a human observer so that there is no privacy interest in them, *see State v. Owens, supra,* 302 Or at 206, a container whose contents are unknown until some non-human instrument is brought to bear has announced nothing. Its contents are not in plain view, plain smell or plain feel. If the plain view/smell doctrines mean anything when applied to a closed container, it must be that a person using only unenhanced human senses must be able to discover the contents of the container without actually intruding into it.[3]

---

[2] This is not a case, like *Dixson/Digby,* where the issue is whether to extend constitutional protection to places or things which are not within the express constitutional language. Rather, the issue here is the extent of protection the constitution gives to an individual's privacy interests in property which the constitution explicitly covers. It amazes me, in light of the various opinions in *Dixson/Digby,* that the majority can say that no Oregon appellate case has rejected the *Katz* analysis. 87 Or App at 614 n 3.

[3] A person may also be able to use the normal human sense of hearing to learn the contents of a conversation without intruding into the protected place where it occurs; that might be called plain hearing.

Breaker's nose was an *enhancement* of normal human senses, and it invaded defendant's protected privacy interest in the storage locker.

In dealing with protections of individual rights, we must avoid an arid literalism which ignores the constitutional purpose. "[C]ourts are apt to err by sticking too closely to the words of a law where those words import a policy that goes beyond them." *Olmstead v. United States,* 277 US 438, 469, 48 S Ct 564, 72 L Ed 944 (1928) (Holmes, J., dissenting); *see also* 277 US at 472-74 (Brandeis, J., dissenting). Article I, section 9, is not designed simply to protect property rights; rather, it extends its protection to "houses, papers, and effects" in order to preserve privacy and individuality. The constitution creates islands of personality from which it excludes the state. *See State v. Dixon/Digby, supra.* In 1859, it was generally sufficient, in order to achieve that purpose, to bring under the constitutional umbrella only those prohibitions on physical intrusions into places and things which had long been part of the common law of trespass. That simple protection of privacy is no longer sufficient.

Nonintrusive methods of learning what one's effect contains or what one does within one's house become steadily more sophisticated. The right to exclude physical intrusions is by itself of little value for protecting privacy if nonintrusive intruders may learn all they wish to know by alternative means. Controlling the *kind* of investigation that the police may conduct is now as important for protecting privacy interests as is controlling the *areas* from which they may conduct it.[4]

A person may protect privacy interests by excluding others from the property and by preventing them from using their own senses to discover the contents of that property from outside the property. One who does not do so cannot demand that the police avert their eyes (or noses) from what is blatantly evident. Thus, a person who exposes himself in his living room window may not complain about the use in his

---

[4] For this reason, the mere fact than an odor escapes from a container does not support a "plain smell" variant of plain view, unless a human is able to smell the odor. A trained dog that sniffs the odor and reacts to it does not do so out of innate curiosity. The dog is a tool that the police use to enhance their ability to learn the contents of the container.

trial for public indecency of pictures that officers took of his actions. *See State v. Louis,* 296 Or 57, 672 P2d 708 (1983). Neither can a person complain if officers smell mash from a distillery in his home. *See State v. Duffy,* 135 Or 290, 295 P 953 (1931). If police see growing marijuana through an open front door, they do not violate the constitution if they use their observations to secure a search warrant. *See State v. Apodaca,* 85 Or App 128, 735 P2d 1264 (1987).[5] The Supreme Court has held that an officer may shine a light through a car window to illuminate the inside, *State v. Riley,* 240 Or 521, 402 P2d 741 (1965); *but see State v. Jackson,* 296 Or 430, 450, 677 P2d 21 (1984) (Lent, J., dissenting), and that observations of the contents of a transparent vial do not violate the possessor's privacy interests. *State v. Owens, supra.* If Mary Ann does not pull her shades down, she cannot complain about what the neighbors see.[6]

The difficulty is that Mary Ann may be on the 15th floor of an apartment building when an officer uses a high-powered telescope, or she may be talking quietly to a friend on the sidewalk when the officer uses a parabolic microphone, or she may be renting a storage unit when the officer uses sensitive measuring equipment to detect and identify emanations that no human nose could smell. How can Mary Ann pull the shades down when she has no reason to believe that she needs to do so or when it may be technically impossible for her to do so effectively? Must she anticipate every technique that ingenious officers may use at the risk of losing her privacy if she does not?

In 1859, pulling down the shades kept out prying eyes; talking quietly disappointed inquisitive ears. With a few exceptions, such as telescopes or bloodhounds, a person's observations were limited to what his or her unenhanced

---

[5] We ordered suppression of the evidence in *Apodaca,* because the police entered to seize the plants without first getting a warrant.

[6] An old song describes what the singer saw through a bedroom window:

"You were combing your auburn hair;
"It was hanging upon the chair.
"If you want to keep your secrets from the neighbors,
"Pull the shades down, Mary Ann."

Mary Ann's privacy rights do not depend on whether she pulls the shades down. Rather, the singer saw what he saw *despite* her privacy and possessory rights; he was where he had a right to be and used only his unaided senses in looking.

senses could detect. The physical limitations of the human senses were the essential protection of privacy interests. Those limitations were not expressly stated, because they were so obvious and today's technology would have appeared so fanciful. Yet they underlie the constitutional provisions. Violations of the constitution were determined by trespass concepts, because a physical intrusion was the only conceivable intrusion.

The Oregon Constitution can continue to protect privacy interests only if it continues to require the physical limitations on which it is based. The Supreme Court appears to have taken that position in *State v. Owens, supra.* Other cases support the same conclusion. In *State v. Blacker,* 52 Or App 1077, 630 P2d 413 (1981), we interpreted the Fourth Amendment to prohibit the use of high-powered telescopes. In *State v. Louis, supra,* 296 Or at 61, the court held that the police may use cameras (including telephoto lenses) or other means of recording or measuring what they observe, so long as the effect of the devices is *not to enhance* the officers' own observations.[7]

We should have no difficulty in placing a dog's nose within this constitutional context. The issue is not whether the defendant had a reasonable expectation, under the privacy analysis derived from *Katz v. United States, supra,* that his property would not be subjected to a limited investigation by a dog. What matters is not the defendant's expectation but the nature of the police activity. Neither is the issue the extent of the police intrusion. Focusing on the physical intrusiveness of the police activity is relevant to whether the police violated a person's property interests, but it is analytically incompatible with recognizing one's privacy interests. *See* Peebles, "The Uninvited Canine Nose and the Right to Privacy: Some Thoughts on *Katz* and Dogs," 11 *Ga L Rev* 75, 93 (1976).[8]

In relying on the "plain smell" variation of "plain

---

[7] The legislature has specifically regulated the interception of electronic communications to achieve a similar result. ORS 133.721 to ORS 133.739; *see State v. Pottle,* 296 Or 274, 677 P2d 1 (1984).

[8] Although the article uses the *Katz* "reasonable expectation of privacy" analysis, its comments are still relevant to privacy interests under the Oregon Constitution.

view,"[9] the majority makes an entirely artifical distinction between enhanced investigations of odors surrounding the property and x-rays or other techniques which penetrate it. The distinction is similar to the discredited distinction in *Olmstead v. United States, supra,* concerning listening devices that did or did not physically intrude into a protected space. It is equally unpersuasive. Either method of investigation uses other than human abilities to intrude into the privacy of the contents of the property, and either method is a search:

> "[A dog sniff] remains a way of detecting the contents of a private, enclosed space. With a trained dog police may obtain information about what is inside a dwelling that they could not derive from the use of their own senses. Consequently, the officers' use of a dog is not a mere improvement of their sense of smell, as ordinary eye glasses improve vision, but is a significant enhancement accomplished by a different, and far superior, sensory instrument." *United States v. Thomas,* 757 F2d 1359, 1367 (2nd Cir 1985).

*See also* 1 Lafave *Search and Seizure* § 2.2(f), 368 (2nd ed 1987).

In my view, the police may not search the contents of an effect by a dog sniff in the absence of reasonable suspicion.[10] *See State v. Kosta,* 75 Or App 713, 708 P2d 365 (1985), *rev allowed* 300 Or 545 (1986). A dog's sense of smell is greater than that of a human and is an enhancement of it. A search based on a random, even serendipitous,[11] dog sniff is therefore impermissible. In such cases, the dog's extraordinary sense of smell permits detection of something that is otherwise not discernible, just as a telescope may permit an officer to

---

[9] There are two "plain view" rules. The first, which is a true exception to the warrant requirement, is that evidence may be seized from a constitutionally protected place without a warrant if (1) there is no illegal intrusion, (2) the evidence is discovered inadvertently and (3) it is immediately apparent to the police that they have evidence before them. *See State v. Walle,* 52 Or App 963, 967, 630 P2d 377 (1981). The second involves a situation in which there is no search, because the officer did not intrude into a constitutionally protected area. *See State v. Roles,* 75 Or App 63, 705 P2d 227 (1985). "Plain smell" is a variation of the second type.

[10] There is no present need to consider the proper use of other enhancements of human senses. Some may be improper in all circumstances, some may require reasonable suspicion and some may require probable cause and a warrant.

[11] One may question how serendipitous this discovery was. The record shows that the officers were getting permission to "train" Breaker in every storage facility in the county.

observe something that is not discernible to the naked eye. *See State v. Blacker, supra.*

Of course, if the officers had smelled the marijuana themselves, their perceptions, not Breaker's, would have justified the warrant. However, that is not what happened. Although Deputy Kennedy did eventually smell the marijuana, Breaker directed him to it. Breaker did not simply allow Kennedy to observe better something that he had already discerned, as a flashlight or binoculars might. *See State v. Berg,* 60 Or App 142, 147, 652 P2d 1272 (1982); *State v. Harp,* 48 Or App 185, 189-90, 616 P2d 564, *rev den* 290 or 171 (1980). Rather, Breaker pointed him in a direction that he would not otherwise have gone. Accordingly, the information which supported the issuance of the search warrant was based on a previous search which violated defendant's privacy rights under Article I, section 9. The taint of that previous search invalidates the later warrants.

I respectfully dissent.

Joseph, C. J., and Newman, J., join in this dissent.